56 Cal.Rptr.3d 151 (2007)
148 Cal.App.4th 841
In re LAUREN R., a Person Coming Under the Juvenile Court Law.
Orange County Social Services Agency, Plaintiff and Respondent,
Velda C. et al., Respondents,
v.
Amanda C, Defendant and Appellant, Lauren R., Minor and Appellant.
No. G037590.
Court of Appeal of California, Fourth District, Division Three.
March 19, 2007.
*152 Charles Bergstrom, Orange; John L. Dodd & Associates and John L. Dodd, Tustin, for Defendant and Appellant Amanda C.
Law Office of Harold LaFlamme, Orange, and Tina Stevens, under appointment by the Court of Appeal, for Minor and Appellant, Lauren R.
Benjamin P. de Mayo, County Counsel, Dana J. Stits, Senior Deputy County Counsel, Paula A. Whaley and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent, Orange County Social Services Agency.
Rich Pfeiffer, for Respondent, Velda C.
Jennifer Mack, under appointment by the Court of Appeal, for Respondent Mother, Laura R.
Nicole Williams and Niccol Kording, under appointment by the Court of Appeal, for Respondent Father, Dennis R.

OPINION
O'LEARY, J.
Amanda C, de facto parent, and Lauren R, the minor, appeal from the juvenile court's order removing Lauren from Amanda's home and placing her for adoption by her maternal aunt, Velda C, who lives in Oregon. Using the factors designated for a temporary relative placement (Welf. & Inst.Code, § 361.3, subd. (a)),[1] the *153 juvenile court found Velda was the better placement. We find the relative placement preference did not apply to the placement order because (1) no new placement was necessary and (2) it was a placement for adoption. Because the placement order was for adoption, we find the caretaker preference (§ 366.26, subd. (k)) was applicable. Accordingly, we remand the case for consideration under the proper statute.

I

FACTS
Lauren R. is 10 years old. She was made a dependent of the juvenile court in Oregon, where her family lived, early in her childhood. The family moved to Orange County when Lauren was five years old. About a year later, she was made a dependent of the Orange County Juvenile Court due to her parents' substance abuse and domestic violence, as well as their failure to protect her from sexual abuse. After 18 months out of her parents' custody, Lauren was returned to her mother under continued supervision by the Orange County Social Services Agency (SSA). But SSA removed her again seven months later and filed a supplemental petition alleging the mother had been arrested for driving under the influence of drugs and alcohol with Lauren in the car. Lauren was placed with Amanda C, who the mother identified as a nonrelative extended family member,[2] on June 1, 2005. Amanda was 23 years old and ran a licensed day care center in her home. She had been Lauren's babysitter and Sunday school teacher for several years.
The juvenile court sustained the supplemental petition in July 2005. At the dispositional hearing on November 16, the court ordered Lauren placed out of parental custody, refused to give further reunification services to the parents, and set a section 366.26 hearing for March 2006. During the almost six months that elapsed between detention and disposition, Lauren remained adamantly opposed to contact with either parent. The visits and conjoint therapy sessions she engaged in with her parents were total failures; both parents verbally abused her in front of visitation monitors and the therapist.
In July, Lauren's maternal aunt, Velda C, told the social worker she was interested in having Lauren placed with her. Because Velda lived in Oregon, the social worker initiated paperwork required by the Interstate Compact for the Placement of Children (ICPC). (Fam.Code, § 7900 et seq.) Lauren visited her aunt for three days in August "to get reacquainted"; she said the visit was "fun." By September, however, Lauren was stating she did not want to live with her aunt in Oregon. In early October, Lauren's therapist "indicated that moving Lauren from her current placement would be detrimental. The reasons being that Lauren is becoming more attached to her current caretaker, Amanda, and to her community, such as her church and school." In early November, Velda came to court to ask for placement. The court authorized a one-week visit in Oregon before Christmas.
*154 In January, SSA reported Oregon had approved Velda's home for placement. Lauren insisted she did not want to be adopted by Velda but wanted to, be adopted by Amanda, who by this time was interested in adoption and was completing the paperwork to initiate a home study. The social worker felt "it may be in Lauren's best interest to be placed in [Velda's] home." On January 18, Amanda was granted de facto parent standing. The social worker took Lauren to Oregon for another visit with Velda at the end of January. The social worker's observation was that Lauren "appeared to feel safe and comfortable in [her] care." However, Lauren continued to insist she wanted Amanda to adopt her, not Velda. The social worker reported that Lauren said "she is worried that Aunt Velda will be nice for a few days and then she would stop being nice" because "`she's my mom's sister and that is how my mom is.'" Lauren was also worried she would have to see her mother if she lived with Velda. "[My] mom will say `I wanna see my daughter and I don't want to see her.'"
At a progress review hearing in early February, the parties stipulated they were on notice that SSA intended to place Lauren with Velda but decided not to move her pending the section 366.26 hearing scheduled for March. The parties agreed "to litigate placement at the [section 366].26 hearing."
Velda moved for de facto parent standing and for relative placement preference under section 361.3 on February 22. In the report prepared by SSA for the section 366.26 hearing, the social worker reported that Amanda "has not yet turned in either the Adoption Questionnaire or her Adoption Application. The home study cannot be started until she has turned in this paperwork. Her assigned adoptive home study worker has recently sent her a follow up letter requesting the information." The parties stipulated that Lauren would have monthly visits with Velda, plus spring break and most of the summer. They also stipulated that Lauren "has a probability for adoption, but is difficult to place and there is no identified or available prospective adoptive parent," and continued the section 366.26 hearing for six months.
In August, the social worker reported that "Lauren has repeatedly stated that she would like to be adopted by her current caretaker, Amanda ... She insists that although she has fun with her family [in Oregon] she wants to remain with [Amanda]." Velda believed Lauren was being manipulated by Amanda. "[Velda] is concerned that when she asks Lauren anything about her life or routine Lauren tells her she needs to ask Amanda about that." Lauren's therapist reported she was consistently happy and stable with Amanda and felt loved by Amanda. The therapist concluded Lauren had a healthy attachment to Amanda but not with her aunt and uncle and "it may be in Lauren's best interest to remain in her current placement."
The social worker also stated in the August report that Amanda was sent follow up letters regarding her adoption application on March 6, March 30, and May 17 because it had not been received by SSA. In July, Amanda told the social worker she sent her application in either January or the first of February. Amanda said she would bring copies of the application to SSA's office on July 17. The social worker received an incomplete application in the mail on August 1. On August 8, the social worker left a message for Amanda requesting she call to make an appointment to begin the home study process. By the next day, when the social worker was writing her report, Amanda had not yet called. "[T]he undersigned is concerned *155 about [Amanda's] lack of action towards completing a homestudy [sic ] and how this may negatively impact Lauren's need for permanency."
By the time of the September report, after two more phone calls, Amanda still had failed to contact the home study worker. On August 29, the home study worker had closed the file due to her lack of response. The social worker wrote, "The undersigned is concerned that despite [Amanda's] stated desire to adopt Lauren, her lack of action towards completing a homestudy [sic ] in the last eight months states otherwise. Additionally, the undersigned is concerned regarding how this failure to complete a homestudy [sic ] may negatively impact Lauren's need for permanency." Lauren's therapist, however, reported that Lauren was doing well in Amanda's home; the therapist believed "that [Amanda's] home is likely the best placement for Lauren" and was concerned "that Lauren does not have a significant attachment to any of her relatives in Oregon."
The section 366.26 hearing finally began on September 6. The court and counsel, most of who had changed in the last six months, discussed whether the parties intended to litigate the placement before or after the section 366.26 hearing when entering into the stipulation in early February. County counsel asked to "proceed with the [section 366].26 first and then address the issue of placement. [¶] ... [¶] There's a concern here that the current caretaker may have certain rights that would be bypassed by proceeding with the placement issue prior to the [section 366].26. Specifically I'm referring to the potential of being designated a prospective adoptive parent."[3] County counsel also pointed out the juvenile court would have to exercise its independent judgment on the placement if the hearing were held before the section 366.26 hearing, whereas after the section 366.26 hearing, SSA's placement decision would be reviewed under an abuse of discretion standard. And finally, county counsel stated, "Of course, there is the [section] 361.3 priority for relatives that the court would have to consider."
The juvenile court expressed its concern about "bargaining in good faith" when the parties entered into the stipulation to hold the placement hearing, observing that the minor's counsel was the only attorney who had been on the case since the beginning. "If the court were to proceed with the [section 366].26 first before the placement and the court were to terminate the parental rights of mother and father, then they would be left without standing to participate in any fashion in the placement. [¶] ... [¶] It would be hard to imagine that parents' counsel would agree that the [section 366].26 would go first, understanding that they may be in a position to have no input at the placement review."
Counsel for the father and for the mother both objected to holding the section 366.26 before the placement review. Minor's *156 counsel said, "Since placement has been at issue since at least February of this year, I believe it was the intent of all [counsel] at the time, who have unfortunately changed, to have a placement hearing with respect to which is the best possible placement for Lauren." Amanda's counsel, who was appointed in January 2006, remarked, "Obviously, your Honor, the Legislature saw a need and enacted [section] 366.26[, subdivision] (a),[4] which is the additional protection that my client would have as having prospective adoptive status. So from that standpoint, I suppose I would really rather have the [section 3661.26 hearing first [¶] ... [¶] [W]e'd like to have the extra protection. But in all fairness, what [minor's counsel] recited, that is what I can remember happening in February and March of this year." After hearing from all counsel, the court decided to hold the placement review hearing before the section 366.26 hearing, indicating it would be exercising its independent judgment on the placement decision "such as discussed in the Cesar V. case."[5]
The court listened to seven days of testimony. Lauren's therapist, who had seen Lauren once a week for over two years, testified Lauren expressed feelings of love and trust for Amanda. "[S]he feels like Amanda is a mom to her." Lauren said she wanted to live with Amanda, "whom she sees as her family," and did not want to live with Velda. The therapist opined that removing Lauren from Amanda's home "would be a real loss for her. I think it would have a significant impact on her," and "she would need to grieve and work through [it]." When asked if Lauren could adapt to a move to Oregon, the therapist answered, "I think she has the coping skills as long as she has good support."
Lauren's social worker, Sidney Holt, testified she recommended Velda as a placement because she had known Lauren as an infant and there were other family members in Oregon. Comparing her to Amanda, Holt stated, "I believe the aunt would be a better placement for Lauren, because if parental rights are terminated, she needs permanency. We have an approved home study with her in Oregon, [¶] We have an incomplete application and a closed case on the other applicant. We don't know that she will ever have an approved home study, nor do we know how long that will take. That negatively impacts Lauren's permanence." Holt admitted she recommended placement with Velda before the Oregon home study was completed and before Amanda's application was considered "late."
Amanda testified she was told Lauren's adoption was "a possibility" by a social worker from Orangewood Children's Home when Lauren was first placed with her. She expressed her interest in adoption to Holt and received a packet of paperwork in January 2006. She sent the packet back "at the end of January, the beginning of February, in that week range." She remembered receiving one letter in March saying she had not turned in the application, but apparently disregarded the letter because she had mailed the application. She did not follow up on the application because "I had contact with [Holt] once a month and I thought she would have been communicating with me if there was something going on." Sometime *157 in the summer of 2006, Holt told Amanda the application had not been received. Amanda sent a copy of the original application a few days later and left a message with the home study worker "to confirm that she got my second sending of the paperwork." At that time, Amanda believed her application was complete, and it was not until the week before trial that her attorney told her it was incomplete. She called the home study worker and, at the worker's direction, faxed a request that "I would like the case to be reopened." Amanda testified no one had ever told her what was wrong with her paperwork, but she had a meeting scheduled with the home study worker during the week following trial.[6]
When asked about Lauren's record of tardies to school, Amanda explained some of the tardies were after Lauren had been visiting Velda in Oregon and had arrived home late the nights before. She explained most of the tardies were due to the habitual lateness of one of her child care clients. Although she attended all parent teacher conferences, no school official had indicated the tardies were a problem for Lauren. But Amanda admitted her responsibility for the situation and acknowledged it was unacceptable.
The court delivered its findings, prefacing them with an explanation of the posture of the case: "The placement review was conducted in order for the court to determine if the Agency abused their [sic ] discretion in deciding to remove the child, and then also for the court to exercise its independent judgment in the placement of the child. [¶] In backtracking to see how we got to this point, the decision to move the child from [Amanda's] home was made much earlier in the year, and the Agency had placement authority. However, it appears that there was an agreement not to move the child prior to the minor being afforded a hearing. The court has now conducted that hearing. [¶] I have considered all of the factors that are listed in [s]ection 361.3 ..., and I would like at this time to briefly comment on the witnesses' testimony."
The court stated Amanda was "intelligent and well-spoken, and it is clear to the court that she loves Lauren and it appears to the court that she wishes to adopt her." But the court was concerned about the late paperwork and wondered why Amanda would take so long. "I have considered whether or not she is ambivalent to the adoption of the child, whether she is second-guessing her earlier decision. [¶] ... [¶] But ... when the court observed [Amanda], she did not come across to the court as ambivalent, so I do not find that to be a likely explanation for the foot-dragging." The court considered and rejected a few more explanations, then stated its conclusion: "[T]he reason for the late and incomplete application and the failure to timely follow up, ... all of that is a product of [Amanda's] maturation level. She is still so young. Procrastination and letting things go and not establishing the proper priorities, those are the things that many, many young adults do. [¶] [T]hat also explains allowing the child Lauren to [ ]rack up 27 tardies since December in *158 her third-grade class. [¶] ... I don't find that [Amanda] was deliberately untruthful. [¶] But in certain responses, her answers were more consistent with what I would describe as child-like exaggeration or misrepresentations. She wants placement, so she fudges on the truth. [¶] ... [¶] These findings about the maturity level of the current caretaker, they only arise because the court must choose the best placement and because I have tried to understand the reasons for the foot-dragging, and that is a significant factor in the court's consideration. [¶] [T]he court is not finding that due to her maturity level or age, that [Amanda] cannot provide appropriate care for a child or for children. In fact, in many areas she has proven to be quite mature and capable. Overall, she has been a fine caretaker for Lauren at a time when Lauren definitely needed one, and the court believes that [Amanda] could continue to be a fine caretaker for this child. [¶] I note that the child is very happy in her care. She's doing well emotionally and educationally. [¶] But the process for the court is one of balancing the benefits and the detriments in the respective prospective placements, and the willingness to provide a permanent adoptive home and actions that reflect that willingness is a significant factor...."
The court then compared Velda to Amanda. "In contrast then, [Velda] is a close relative to the child. She has the maturity to follow through and to ensure that Lauren's needs are met. She has successfully parented her own daughter through those difficult teen years, through which this minor, Lauren, has yet to enter. And it is clear to the court that she too loves the child and is dedicated to her. [¶] There are benefits to this placement as well, such as providing relationships with her young blood cousins. I note that this child, Lauren, is an only child, so that is a significant benefit to this child as well: contact with other blood relatives."
The court ordered Lauren to be placed with Velda as of October 1. The court then found adoption to be the permanent plan and terminated parental rights of both parents. Amanda and Lauren appealed the placement order and also filed a petition for writ of supersedeas to stay Lauren's move to Oregon pending the resolution of the appeal. After a hearing, we issued the writ of supersedeas.

II

DISCUSSION
Amanda and Lauren contend the order placing Lauren with Velda must be vacated because neither the trial court nor SSA complied with the caretaker preference statute (§ 366.26, subd. (k), hereafter "Subdivision (k)" or "caretaker preference").[7] They argue the caretaker preference applies to Amanda and, under its terms, she was entitled to have her adoption application processed before Velda's. Because the juvenile court failed to comply with Subdivision (k) and erroneously applied the relative placement preference statute (§ 361.3), they argue, the court's placement order must be set aside and the case must be remanded for compliance with Subdivision (k). Velda, SSA, and the *159 parents argue Subdivision (k) applies only after parental rights have been terminated. They argue because the placement determination was made before the termination of parental rights, the juvenile court properly exercised its independent judgment to place Lauren for adoption in a relative placement.
We find the relative placement preference did not apply to the placement order because (1) no new placement was necessary and (2) it was not a temporary placement. Because the placement order was for adoption, we find Subdivision (k) was applicable. The trial court, however, mistakenly assumed the relative placement preference applied and based its decision on the statutory elements in section 361.3, subdivision (a). Accordingly, we remand the case for consideration under the proper statute.

Waiver
Preliminarily, we address Velda's contention that Amanda and Lauren forfeited any claim that the juvenile court erred in failing to apply Subdivision (k) by stipulating to hold the placement review hearing before the section 366.26 hearing. This contention is not well taken. The discussion between the juvenile court and counsel was about whether the court would exercise its independent judgment or review the placement for an abuse of discretion by SSA and the implications of the hearing sequence on the standing rights of the parents. The only allusion to Subdivision (k) was an oblique one by Amanda's counsel, who stated he "would really rather have the [section 366].26 hearing first" because he thought it would give Amanda "additional protection ... as having prospective adoptive status." It appears he was mixing up the caretaker preference and the prospective adoptive parent designation. A statement by counsel made in a state of such profound confusion cannot be construed as an express waiver of Amanda's rights.
Furthermore, even if a waiver could be found, this case presents important issues of law. We have inherent discretion to entertain the issues on appeal. (In re S.B. (2004) 32 Cal.4th 1287, 1293-1294, 13 Cal.Rptr.3d 786, 90 P.3d 746.)

Relative Placement Preference
The relative placement preference is set out in section 361.3. It gives "preferential consideration" to a request by a relative of a child who has been removed from parental custody for placement of that child. "`Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) The preference applies at the dispositional hearing and thereafter "whenever a new placement of the child must be made ..." (§ 361.3, subd. (d).)[8]
*160 Here, SSA wanted to remove Lauren from Amanda's home to place her for adoption by Velda. This did not constitute a necessary new placement within the meaning of the relative placement preference. There is no relative placement preference for adoption. (Cesar V.; Department of Social Services v. Superior Court (1997) 58 Cal.App.4th 721, 68 Cal.Rptr.2d 239; In re Sarah S. (1996) 43 Cal.App.4th 274, 50 Cal.Rptr.2d 503.)
Velda points out that she asked for relative placement early in the proceedings, but the ICPC requirements for an out-of-state placement were not completed until January 2006. She argues it is unfair to out-of-state relatives if the relative placement preference can be lost by the passage of time.
The overriding concern of dependency proceedings, however, is not the interest of extended family members but the interest of the child. "[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected." (In re Stephanie M. (1994) 7 Cal.4th 295, 321, 27 Cal.Rptr.2d 595, 867 P.2d 706.) Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. (Id. at p. 320, 27 Cal.Rptr.2d 595, 867 P.2d 706.) The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests. (Id. at p. 319, 27 Cal.Rptr.2d 595, 867 P.2d 706.)

Caretaker Preference
Unlike the relative placement preference, the caretaker preference applies specifically to applications for adoption. Subdivision (k) provides, "Notwithstanding any other provision of law, the application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the relative care *161 taker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being, [¶] As used in this subdivision, `preference' means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child."
Velda argues the caretaker preference applies only after termination of parental rights. She points to the language of the statute, which specifies the preference is for a caretaker of a "child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption," contending the court does not approve adoption as a permanent plan until parental rights are terminated and the permanent plan is selected.
We think the circumstance that triggers the application of the caretaker preference is the intent to place the child for adoption, not necessarily the termination of parental rights or the termination of reunification services. The rules of statutory construction support our view.
Subdivision (k) sets forth alternative bases for the application of the caretaker preference: It applies to a person who is caring for a child "for whom the court has approved a permanent plan for adoption, or who has been freed for adoption." (Italics added.) "Or" is disjunctive, indicating the Legislature intended an alternative application. (Houge v. Ford (1955) 44 Cal.2d 706, 712, 285 P.2d 257.) When parental rights are terminated at a section 366.26 hearing, the juvenile court is directed to "order that the child be placed for adoption" unless one of the statutory exceptions applies. (§ 366.26, subd. (b)(1).) With such an order, the juvenile court effectively frees the child for adoption. Because the Legislature also specified the caretaker preference applies when the court has approved a permanent plan for adoption, we must presume it meant something different from "ordering" adoption. Otherwise, the alternative basis would be surplusage, a prohibited construction. (Eisner v. Uveges (2004) 34 Cal.4th 915, 931, 22 Cal.Rptr.3d 530, 102 P.3d 915.)
The court approved a permanent plan of adoption for Lauren in March 2006, when it continued the section 366.26 hearing based on the findings it made under section 366.26, subdivision (c)(3), identifying adoption as the permanent placement goal and ordering SSA to find an adoptive family for her within six months.[9] At that *162 point, all efforts by SSA to place Lauren were specifically directed at adoption, and the caretaker preference applied.
Velda cites In re Sarah S., supra, 43 Cal.App.4th 50 Cal.Rptr.2d 503 and Cesar V. in support of her contention that Subdivision (k) only applies after the termination of parental rights. But the cases do not stand for that proposition.
In Sarah S., two couples wanted to adopt the minor: her nonrelative caretakers, with whom she had formed a close bond, and her maternal uncle and his wife, who lived out-of-state but had consistently expressed their desire to adopt. The maternal uncle contended he had a statutory preference to adopt under the relative placement preference of section 361.3. The court held "the statutory preference for placement of a dependent child with a relative ... does not apply to a placement made as part of a permanent plan for adoption." (In re Sarah S., supra, 43 Cal.App.4th at pp. 276-277, 50 Cal.Rptr.2d 503, fn. omitted.) It found the statute applies to temporary rather than permanent placements. Application of the relative placement preference "requires consideration of the parents' wishes (§ 361.3, subd. (a)(2)), of the caretaker's ability to protect the child from his or her parents (§ 361.3, subd. (a)(6)(D)), and of the ability of the relative to facilitate court-ordered reunification efforts (§ 361.3, subd. (a)(6)(E)), factors that are wholly or largely irrelevant once parental rights are terminated. By its own terms, therefore, section 361.3 applies when `a child is removed from the physical custody of his or her parents' and thus must be `placed' in a temporary home, not when reunification efforts have failed and a permanent plan for adoption has been approved (or when a child has otherwise been freed for adoption)." (Id. at p. 284, 50 Cal.Rptr.2d 503.)
The court contrasted section 361.3 with the caretaker preference for adoption in Subdivision (k). "[S]ection 361.3 assures interested relatives that, when a child is taken from her parents and placed outside the home pending the determination whether reunification is possible, the relative's application will be considered before a stranger's application.... When reunification fails, ... [S]ubdivision (k) assures a 'relative caretaker' who has cared for the child that, when parental rights are terminated and the child is freed for adoption, his or her application will be considered before those submitted by other relatives and strangers." (In re Sarah S., supra, 43 Cal.App.4th at p. 285, 50 Cal.Rptr.2d 503.)
Cesar V. involved the refusal of SSA to place the dependent children with the paternal grandmother after reunification services were terminated and a new placement became necessary. Although the court ordered SSA to evaluate the grandmother for possible placement, SSA placed the children with another foster family. At the section 366.26 hearing held five months later, the father challenged SSA's denial of placement with the grandmother as an abuse of discretion. The parties stipulated to resolve the placement challenge before the section 366.26 issues. Testimony revealed that SSA performed an incomplete evaluation of the grandmother and decided that the foster family would be a better placement. The father objected to the comparison, asserting the relative placement preference required SSA to evaluate the grandmother before any other placement. The juvenile court overruled the objection, stating the relative placement preference did not apply after the termination of reunification services *163 and, furthermore, it could only review SSA's placement decision for an abuse of discretion.
The appellate court held the relative placement preference "applies when a new placement becomes necessary after reunification services are terminated but before parental rights are terminated and adoptive placement becomes an issue." (Cesar V. at p. 1032, 111 Cal.Rptr.2d 243, italics added.) Although reunification services were terminated, the children needed a temporary placement pending the section 366.26 hearing. SSA was looking ahead to potential adoptive placement, but it was not soliciting adoption applications and adoption had not been identified by the court as the children's permanent placement goal. The grandmother was entitled to serious consideration as a placement before adoption became the issue; if the children had been placed in her care for several months by the time the children were freed for adoption, she might have qualified for the caretaker preference under Subdivision (k).
The Cesar V. court also held the juvenile court must use its independent judgment on the relative placement preference issue rather than reviewing SSA's action for an abuse of discretion. This holding was based squarely on the statute. Section 366.26, subdivision (j) provides: "If the court, by order or judgment, declares the child free from the custody and control of both parents, or one parent if the other does not have custody and control, the court shall at the same time order the child referred to the State Department of Social Services or a licensed adoption agency for adoptive placement by the agency.... The State Department of Social Services or licensed adoption agency shall be responsible for the custody and supervision of the child and shall be entitled to the exclusive care and control of the child at all times until a petition for adoption is granted ...." (Italics added.) The abuse of discretion standard does not apply until the parental rights are terminated. This has nothing to do with whether the caretaker preference applies when SSA is soliciting applications for adoption after the court has approved adoption as a permanent plan but before parental rights are terminated. (See Department of Social Services v. Superior Court (1997) 58 Cal.App.4th 721, 68 Cal.Rptr.2d 239.)
Having concluded the caretaker preference applies to applications for adoption both before and after the termination of parental rights, we consider whether Amanda qualified for the preference, which is a different question. Subdivision (k) specifies a caretaker's adoption application is given preference "if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being." (Italics added.) Amanda contends the agency, here SSA, must determine only the first prong of the qualifying phrase, leaving the second to the determination of the juvenile court, but we conclude the statute clearly requires SSA to make both determinations.
There is similar language elsewhere in section 366.26 that requires the juvenile court to make a finding about the emotional effect of removal from a caretaker on a child. The court may determine the termination of parental rights to an adoptable child is detrimental if "[t]he child is living with a relative or foster parent who is unable or unwilling to adopt the child because of exceptional circumstances, that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment and the removal of the child from the *164 physical custody of his or her relative or foster parent would be detrimental to the emotional well-being of the child." (§ 366.26, subd. (c)(1)(D), italics added.) If the juvenile court finds termination of parental rights would be detrimental to an adoptable child because one of the statutory exceptions applies or if it cannot terminate parental rights because it finds reasonable services were not offered to the parents, the statute directs it to order guardianship for the child, preferably with the child's current caretaker. However, "[i]f the child is living with a relative or a foster parent who is willing and capable of providing a stable and permanent environment, but not willing to become a legal guardian, the child shall not be removed from the home if the court finds the removal would be seriously detrimental to the emotional well-being of the child because the child has substantial psychological ties to the relative caretaker or foster parents." (§ 366.26, subd. (c)(4)(B), italics added.)
In contrast to the foregoing sections, in Subdivision (k) the Legislature specifically designated the agency as the entity to determine if the child has substantial emotional ties to her caretaker and removal from the caretaker would be seriously detrimental to the child's emotional well-being. There is nothing to indicate the Legislature intended to separate the two prongs of the qualifying language into a determination by the agency and a determination by the juvenile court. In light of the language in the foregoing sections, it is clear the Legislature would have specifically separated the two determinations if it had intended to do so.
The parties agree SSA determined Lauren has substantial emotional ties to Amanda. But it did not determine Lauren's removal from Ananda would be "seriously detrimental" to her well-being. Velda argues such a determination can be inferred from SSA's consistently expressed intent to place Lauren with Velda. We are reluctant to make such an inference, however, in light of the obvious confusion about the applicable law. And if, on remand, SSA determines Lauren's removal from Amanda would not be detrimental, Amanda is entitled to judicial review of that determination at the placement hearing.
Velda argues even if Subdivision (k) applies, Amanda suffered no prejudice because the preference only allows her application to be processed first; it does not create a presumption that Amanda should be placed with her. Velda contends the record is clear the court preferred her. We agree the court preferred Velda to Amanda, but that preference was based largely on Velda's status as a relative. At the hearing, the juvenile court explicitly compared Amanda to Velda, describing its role as that of choosing the best placement for Lauren. But the court's positive comments about Velda emphasized Velda's status as a "close relative" and her ability to provide Lauren "relationships with her young blood cousins," factors that indicated the court's confusion about the applicable law.
The record indicates SSA also preferred Velda because she is a relative. The social worker liked Velda better than Amanda early on, before the application difficulties occurred, and felt Lauren should be placed with Velda because she had known Lauren as an infant and there were other family members in Oregon. If the caretaker preference applies to Amanda, however, her application should have been processed and a home study done before SSA even considered Velda. It is likely SSA would have approved Amanda for adoption if she had been fairly evaluated without being compared to Velda.
If Amanda was entitled to the caretaker preference, her application should have received *165 serious and thorough preferential consideration. And if she was not so entitled, then at least she should have been evaluated for adoptive placement on a level playing field with Velda. This is not what occurred. The juvenile court mistakenly applied the factors to be considered in a temporary relative placement to a determination of which person would be the better adoptive placement. Velda's standing as a relative clearly influenced the court, as indicated by its comments when making findings. We cannot infer, as Velda urges us to do, that remand is useless because the record indicates the court will find removal from Amanda is not detrimental.

III

DISPOSITION
The order placing Lauren with Velda for adoption is reversed. SSA is directed to make explicit determinations as to whether Amanda qualifies for the caretaker preference under Subdivision (k). If SSA determines she does not qualify, the juvenile court shall review the determination using its independent judgment. If the juvenile court finds Amanda does qualify under Subdivision (k), her application for adoption shall be processed and the home study completed before a new placement hearing is held. If she does not qualify under Subdivision (k), the juvenile court shall hold a new placement hearing without according a preference to Velda based on her status as a relative of Lauren. The writ of supersedeas staying the order of the trial court shall dissolve upon issuance of the remittitur.
RYLAARSDAM, Acting P.J., and BEDSWORTH, J., concur.
NOTES
[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.
[2] Under section 362.7, a "`nonrelative extended family member' is defined as any adult caregiver who has an established familial or mentoring relationship with the child. The county welfare department shall verify the existence of a relationship through interviews with the parent and child or with one or more third parties." SSA must evaluate the nonrelative extended family member's home and approve or deny the home "pursuant to the same standards set forth in the regulations for the licensing of foster family homes which prescribe standards of safety and sanitation for the physical plant and standards for basic person care, supervision, and services provided by the caregiver.
[3] The designation of "prospective adoptive parent" was added to section 366.26 as subdivision (n) in 2005, taking effect in January 2006. It allows the juvenile court, at the section 366.26 hearing or anytime thereafter, to "designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process." (§ 366.26, subd. (n)(1).) A prospective adoptive parent has the right to a hearing before SSA can remove a child from his or her home unless there is an immediate risk of harm to the child. The child shall not be removed unless the juvenile court finds removal is in the child's best interests. (§ 366.26, subds. (n)(3)(A) & (B).)
[4] The parties apparently assume Amanda's counsel meant subdivision (k) of section 366.26, not subdivision (a).
[5] Cesar V. v. Superior Court (2001) 91 Cal. App.4th 1023, 111 Cal.Rptr.2d 243 (Cesar V.) [before termination of parental rights, the juvenile court must exercise its independent judgment on a placement decision].
[6] Amanda requests this court take additional evidence on appeal (Code Civ. Proc, § 909), consisting of her declaration about events following trial relating to her second adoption application. We will use our authority to take post-judgment evidence "sparingly" and only when "exceptional circumstances" require it. (In re Zeth S. (2003) 31 Cal.4th 396, 405, 2 Cal.Rptr.3d 683, 73 P.3d 541.) The proffered evidence is not helpful in the resolution of the issues before us and will not obviate the need for remand. (Code Civ. Proc, § 909.) Therefore, we decline to exercise our discretion to take additional evidence and deny Amanda's request.
[7] Amanda requests judicial notice of the legislative history of Assembly Bill No. 2982 (1993-1994 Reg. Sess.), which she claims enacted Subdivision (k). But the passage of Assembly Bill No. 2982 (Stats. 1994, ch. 324) did not enact Subdivision (k); it amended section 366.26 in other ways and renumbered certain subdivisions, renumbering subdivision (j) as the current Subdivision (k) without changing the language. Because the proffered documents are irrelevant to the issues on appeal, we deny Amanda's request for judicial notice.
[8] We quote the pertinent parts of section 361.3: "(a) In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative. In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors: [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement. [¶] (4) Placement of siblings and half-siblings in the same home, if that placement is found to be in the best interest of each of the children as provided in Section 16002.[¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect, [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure, and stable environment for the child, [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E) Facilitate court-ordered reunification efforts with the parents, [¶] (F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan, [¶] (H) Provide legal permanence for the child if reunification fails. [¶] However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative. [¶] (I) Arrange for appropriate and safe child care, as necessary. [¶] (8) The safety of the relative's home .... (c) For purposes of this section: (1) `Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated .... (d) Subsequent to the hearing conducted pursuant to Section 358, whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements...."
[9] Section 366.26, subdivision (c)(3) provides: "If the court finds that termination of parental rights would not be detrimental to the child pursuant to paragraph (1) and that the child has a probability for adoption but is difficult to place for adoption and there is no identified or available prospective adoptive parent, the court may identify adoption as the permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days. During this 180-day period, the public agency responsible for seeking adoptive parents for each child shall, to the extent possible, ask each child who is 10 years of age or older, to identify any individuals, other than the child's siblings, who are important to the child, in order to identify potential adoptive parents. The public agency may ask any other child to provide that information, as appropriate. During the 180-day period, the public agency shall, to the extent possible, contact other private and public adoption agencies regarding the availability of the child for adoption. During the 180-day period, the public agency shall conduct the search for adoptive parents in the same manner as prescribed for children in Sections 8708 and 8709 of the Family Code. At the expiration of this period, another hearing shall be held and the court shall proceed pursuant to paragraph (1) or (3) of subdivision (b). For purposes of this section, a child may only be found to be difficult to place for adoption if there is no identified or available prospective adoptive parent for the child because of the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is the age of seven years or more."'