Filed 6/27/14  Cameron D. v. Superior Court CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CAMERON D. et al., | D065584 |
| Petitioners, | |
| v. | (San Diego County Super. Ct. No. J518683) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

PROCEEDINGS for extraordinary relief after reference to a Welfare and Institutions Code section 366.26 hearing.  Kimberlee A. Lagotta, Judge.  Petition granted; stay vacated.

Dependency Legal Group of San Diego and John P. McCurley for Petitioner Cameron D.

Dependency Legal Group of San Diego and Tracy M. De Soto for Petitioner Jessica D.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Cameron D. seeks writ review of an order denying his petition under Welfare and Institutions Code section 388[1] in the juvenile dependency case of his minor son, Jaylen D. The petition seeks to place Jaylen in the home of Beverly J., Cameron's mother, rather than foster care. Cameron contends the court abused its discretion by not applying the relative placement preference (§ 361.3) and determining that placement with Beverly was not in Jaylen's best interests. Jaylen's mother, Jessica D., joins Cameron's writ petition. We conclude that the juvenile court prejudicially erred by not applying section 361.3 and therefore abused its discretion. We grant the writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 7, 2013, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (b), on behalf of eight-week-old Jaylen. At birth, Jaylen tested positive for methadone and suffered symptoms of severe withdrawal. Jaylen required treatment in a neonatal intensive care unit from birth through the filing of the petition. Jayden's mother, Jessica, used alcohol and drugs while pregnant and had a history of heroin, marijuana, and methamphetamine use. The Agency concluded that Jaylen had suffered, or was at substantial risk of suffering, serious physical harm or illness as a result of Jessica's failure to protect Jaylen or provide for his care.

---

1  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

At Jaylen's detention hearing, the court found the Agency had made a prima facie showing under section 300, subdivision (b), and ordered that Jaylen be detained in out-of-home care. Jessica told the Agency that two men could be Jaylen's father, one of whom was Cameron. The court ordered paternity testing, which later revealed Cameron to be Jaylen's biological father.

Cameron told the Agency he had another son, D.D., who was a dependent of the juvenile court and placed with his mother Beverly. The Agency reported that Cameron "expressed some concerns" with that placement. A couple weeks later, Cameron told the Agency he would like Jaylen placed with his father, Jessica's aunt, or his mother Beverly.

At a settlement conference, the court sustained the allegations of the petition as amended. At the contested disposition hearing, the court removed Jaylen from his parents' custody and ordered reunification services for Jessica. The court denied services to Cameron based on his failure to reunify with D.D. (§ 361.5, subd. (b)(10).) The court ordered that all available family members be evaluated for placement prior to the six-month review hearing. Jaylen was placed in a confidential foster home.

The Agency contacted Cameron's father and stepmother to assess potential placement for Jaylen. After some thought, they declined to be considered based on concerns over the stepmother's health. The Agency also contacted Jessica's relatives for potential placement. The Agency did not contact Beverly.

Approximately four months into Jaylen's dependency case, Beverly contacted the Agency social worker responsible for Jaylen and expressed interest in placement. In addition to D.D., Beverly was caring for Cameron's two other children, who were also in dependency proceedings. The Agency began an assessment but expressed concerns about Beverly's ability to care for Jaylen in addition to the three other children, all of whom were under the age of two.

3

Beverly also had her adult daughter, Kyra, living with her. Kyra is mentally disabled. While she assisted with the children's care, such as feeding and bathing them, Beverly would not leave Kyra alone with the children. During a visitation between Beverly and Jayden, an Agency social worker asked Kyra how she would feel if Jaylen were placed in the home with the three other children. According to the social worker, Kyra shook her head and said "[t]hat would be too much."

Given its concerns, the Agency requested that Beverly provide information about her support system and ask them to attend a team decision making meeting (TDM) with the Agency. The purpose of the TDM was to formulate a plan of support for Beverly. After some initial hesitation, Beverly attended the TDM with 17 support individuals, including family, church family, and family friends. The TDM identified a primary and secondary support system for Beverly, which could assist her with routine and emergency care for Jaylen. During the TDM, the Agency brought up Kyra's apparent reticence about Jaylen's placement. The Agency social worker present reported that Kyra said "yeah" at that point, though Beverly and other members of her support system testified that Kyra did not say anything.

Shortly before the TDM, Cameron filed a petition under section 388 seeking placement of Jaylen with his mother Beverly, rather than foster care. Cameron argued that Beverly's willingness to care for Jaylen was a change in circumstance. Cameron also argued changed circumstances based on the Agency's scheduled TDM, Beverly's attempts to secure a larger home, and Beverly's offer to place two children in a Head Start program to help with the burden of their care during the day. Cameron argued that placement with Beverly would be in the best interests of Jaylen because his relatives, including three half siblings, lived there. Any harm from

4

removing Jaylen from foster care, where he had thrived, would be outweighed by the benefit of growing up with his biological family.

The Agency opposed, arguing that Jaylen's foster father had provided exceptional care and there was no need to change placement. The Agency reiterated its concerns over Beverly's ability to care for four small children, as well as supervise Kyra. The Agency also pointed to Beverly's reluctance to participate in the TDM and to provide details of Kyra's mental disability. The Agency expressed concern that Beverly's care for the three children already in her household would suffer if Jaylen were placed there as well.

The court found that Cameron's petition stated a prima facie case and scheduled a hearing on the merits. The hearing coincided with a contested six-month review hearing in which the Agency recommended that Jessica's services be terminated.

At the hearing, Beverly testified that she first became aware of Jaylen's dependency when the Agency social worker for Cameron's two younger children told her about him. Beverly understood that a social worker responsible for Jaylen would contact her directly. Jaylen's Agency social worker testified that she received Beverly's contact information from her colleague, but she did not attempt to contact Beverly. When Beverly did not hear anything, she contacted Jaylen's social worker herself.

Beverly wanted to care for Jaylen because "he's my grandson, he's my flesh and blood, and all of the family want to meet him." She wanted Jaylen to grow up with his family and his three half siblings. Beverly had cared for two-year-old D.D. since he was an infant. The other two children, twins who were a year old, had been in her care for approximately six months. None of the children had special needs. Beverly and Kyra take care of the children, and Beverly has used day care in the past when she needed to leave the house. Her family and church friends are also

willing to help out. But Beverly did not feel overwhelmed caring for the children and had never heard Kyra express unhappiness. Several members of Beverly's support system also testified that they had helped with the children in the past and were willing to do so in the future. They had observed Beverly with the children and believed she was an excellent caregiver. Beverly does not work outside the home.

In response to the Agency's concerns, Beverly obtained a larger car to transport all of the children. Beverly also requested federal assistance for a larger home, as her current home only has two bedrooms. The three children slept in cribs in one bedroom, and Kyra slept in the second bedroom. Beverly obtained a crib for Jaylen, and she planned to have him sleep in Kyra's room. Beverly slept in the living room.

The Agency social worker assigned to Jaylen's case testified that Jaylen had a warm and bonded relationship with his foster father, George M. George was willing to adopt Jayden. Prior to placement, George often visited Jaylen in the hospital. When Jaylen was discharged, he was placed immediately with George. Agency reports showed George to be an exceptionally attentive caregiver, and Jaylen's recovery had exceeded expectations. Nothing about Jaylen's placement necessitated a change. The social worker was concerned that Jaylen would not get the same quality of care with Beverly given the other children in the household. While George had two other foster children in his home, they were aged seven and eight. On cross-examination, however, the social worker agreed that Beverly's TDM support plan obviated the Agency's concerns about Beverly's ability to care for Jaylen and her other children. The social worker stated, "Yes, it would take care of the concern of her ability with -- to care for four children."

6

Jaylen was bonded to his foster brothers. He had no bond to his half siblings in Beverly's care. Beverly had only visited Jaylen once, and the Agency appears to have had difficulty scheduling further visits because of resource constraints.

Cameron testified at trial as well. He told the Agency in the early stages of Jaylen's dependency case that he would like Jaylen placed with Beverly. He did not provide the Agency with Beverly's phone number because he forgot it. Cameron did not always get along with Beverly, but he denied telling the Agency that she should not have custody of his children.

Jessica joined in Cameron's petition. Jaylen's counsel, along with the Agency, opposed. After hearing argument on Jaylen's best interests and the applicability of the relative placement preference (§ 361.3), the court denied Cameron's petition. The court explained that Cameron had shown a change in circumstances, but that a change in placement would not serve the best interests of the child. At the hearing, the court explained as follows:

> "[T]he court finds that the case law previously cited does not support the change of orders at this stage. Specifically *In re Lauren R.* [(2007) 148 Cal.App.4th 841] indicates that the relative placement preference applies at initial removal and placement and whenever a new placement must be made.

> "Unfortunately, we are past jurisdiction and disposition, which occurred back in August of 2013.

> "At this point the [section] 361.3 relative placement preference is not applicable at this time. In addition, the court does not find at this point that there has been evidence presented that indicates that a new placement is needed.

> "To the contrary, the court heard evidence, as well as the stipulation of all sides, based upon the letter presented by [George], that he is being well cared for, he is loved, and he is in a stable placement."

The court emphasized that Beverly was "a truly wonderful and caring grandmother" and its ruling was not based on any fault on her part. Instead, the court stated, "At this stage, given the

7

fact there is no relationship yet between grandmother or half[]siblings, it would be detrimental to change placement from the licensed foster home to the paternal grandmother, [Beverly]." The court criticized the Agency's failure to involve Beverly in Jaylen's dependency case:

> "The court is very disappointed with the Agency's failure to facilitate the assessment of placement with [Beverly] until January of this year, as well as the TDM that occurred in March. [¶] . . . [¶]
>
> "I'm so disappointed in the lack of effort that the Agency has made to facilitate a relationship between [Beverly] and Jaylen as well as his half[]siblings."

The court ordered twice-weekly visitation between Beverly and Jaylen, with discretion to permit overnight and 60-day trial visits. The court noted that the Agency should consider "future relative placement with [Beverly] . . . ."

The court proceeded with the six-month review hearing. Following a review of the exhibits and argument, the court found Jessica had not made substantial progress with her case plan, there was not a substantial probability that Jaylen would be returned to Jessica by the 12-month date, and termination of Jessica's services was appropriate. The court scheduled a selection and implementation hearing under section 366.26.

Cameron filed a notice of appeal from the court's order denying his petition. Jessica filed a notice of intent to file a writ petition. (Cal. Rules of Court, rule 8.450.) Because Cameron challenged an order made during a hearing in which a selection and implementation hearing under section 366.26 was set, we ordered that Cameron's appeal proceed by petition for writ review. (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 247.) Jessica joins in Cameron's writ petition, but she does not challenge any other aspects of the hearing.

## DISCUSSION

### I

"Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ." (§ 388, subd. (a)(1).) "If the petition filed under section 388[, subdivision] (a) . . . states a change of circumstance or new evidence and it appears that the best interest of the child, nonminor, or nonminor dependent may be promoted by the proposed change of order or termination of jurisdiction, the court may grant the petition . . . ." (Cal. Rules of Court, rule 5.570(e)(1); see also *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)

"We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. [Citations.] The abuse of discretion standard gives the court substantial latitude. However, the scope of the court's discretion is determined by the legal principles governing the subject of the action. A judicial determination that falls outside the applicable principles of law constitutes an abuse of discretion." (*In re Y.M.* (2012) 207 Cal.App.4th 892, 918; see also *In re B.D., supra*, 159 Cal.App.4th at p. 1228.) "[A] court abuses its discretion when it applies incorrect legal standards [citation]." (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 289.) Cameron bears the burden of showing that the juvenile court abused its discretion in denying his petition under section 388. (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423.)

### II

The juvenile court found the resolution of any concerns about Beverly's ability to care for Jaylen, including the Agency's concession that its own concerns had been resolved, constituted a change in circumstances under section 388. Neither Cameron nor the Agency challenges this

9

finding in this court. Instead, Cameron contends the juvenile court abused its discretion with respect to the second prong, the best interests of the child. Cameron argues the juvenile court erred by not applying the relative placement preference under section 361.3 in assessing Cameron's request that Jaylen's placement be changed from foster care to Cameron's mother Beverly. The Agency counters that section 361.3 applies only at disposition or when a new placement is needed. Because Jaylen's disposition hearing occurred six months before Cameron's petition was filed, and Jaylen was not otherwise in need of a new placement, the Agency argues that section 361.3 does not apply.

Section 361.3, subdivision (a) states, "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ." " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "[T]he statute express[es] a command that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best *interest* of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320 (*Stephanie M.*).) Among other things, the statute identifies a number of factors the court should consider when assessing a potential relative placement. (§ 361, subd. (a)(1)-(8).)

We disagree with the Agency's contention that the relative placement preference does not apply in the context of Cameron's petition under section 388. "Appellate court decisions have consistently held that the relative placement preference applies at least through the family reunification period. [Citations.] During the reunification period, the preference applies regardless of whether a new placement is required or is otherwise being considered by the dependency court." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 795 (*Joseph T.*); see also 10

10

Witkin, Summary of Cal. Law (2014 supp.) Parent and Child, § 638, p. 420.)  Because reunification services were being provided to Jaylen's mother, Jessica, at the time of the petition and hearing, the relative placement preference applied.  (See *ibid.*)

The Agency relies on two decisions from this District that appear to contain contrary language.  (See *In re Lauren R.* (2007) 148 Cal.App.4th 841, 854 (*Lauren R.*); *In re N.V.* (2010) 189 Cal.App.4th 25, 31 (*N.V.*).)  These decisions did not squarely decide the applicability of section 361.3 in this context.

In *Lauren R.*, the court considered whether the relative placement preference applied in the context of a placement for adoption.  (*Lauren R., supra*, 148 Cal.App.4th at p. 855.)  The court found that the relative placement preference did not apply to adoption; rather, the caretaker preference under section 366.26, subdivision (k) applied.  (*Ibid.* ["Unlike the relative placement preference, the caretaker preference applies specifically to applications for adoption."]; see also *In re Sarah S.* (1996) 43 Cal.App.4th 274, 284-285.)  Under the plain language of the caretaker preference, "[i]t applies to a person who is caring for a child 'for whom the court has approved a permanent plan of adoption, *or* who has been freed for adoption."  (*Lauren R.,* at p. 856, quoting § 366.26, subd. (k).)  Neither of these circumstances apply here.

As the Agency points out, *Lauren R.* interpreted the relative placement preference narrowly:  "The preference applies at the dispositional hearing and thereafter 'whenever a new placement of the child must be made . . . .'  (§ 361.3, subd. (d).)"  (*Lauren R., supra*, 148 Cal.App.4th at p. 854.)  Section 361.3, subdivision (d) states in relevant part: "Subsequent to the [dispositional] hearing . . . , whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan

requirements." This subdivision, which was a later amendment to the statute, identifies an additional circumstance where the relative placement preference applies. It does not override subdivision (a), which requires that "preferential consideration shall be given to a *request* by a relative of the child for placement of the child with the relative . . . ." (§ 361.3, subd. (a), italics added; see also *Joseph T., supra*, 163 Cal.App.4th at p. 795 ["Nothing in the language of [§ 361.3, subd.] (d) eliminates the relative placement preference when a qualified relative comes forward after the initial placement and during the family reunification period and seeks placement of the child."].)

Our interpretation of the relative placement preference "was the law at the time [section 361.3] subdivision (d) was enacted and there is nothing in the plain language of the subdivision to change that law." (*Joseph T., supra*, 163 Cal.App.4th at p. 795; see also *In re Jessica Z.* (1990) 225 Cal.App.3d 1089, 1099; 10 Witkin, Summary of Cal. Law (10th ed. 2005) Parent and Child, § 638, p. 774.) As the court in *Joseph T.* explained, the legislative history of subdivision (d) and public policies favoring relative placement likewise support our interpretation. (*Joseph T.,* at pp. 795-798.)

Similar language in this court's decision in *N.V.*, which relied on *Lauren R.*, is unpersuasive for the same reasons. (See *N.V., supra*, 189 Cal.App.4th at p. 31 ["Once a child is placed in the home of a nonrelative at the dispositional hearing, the relative placement preference does not arise again until 'a new placement of the child must be made.' [Citations.]"].) Again, the specific application of section 361.3 here was not directly at issue. In *N.V.*, this court considered an appeal from a disposition order where the relative placement preference plainly applied. (*N.V.,* at pp. 29-30.) The mother of the dependent children contended that the juvenile court erred during the dispositional hearing by excluding evidence relating to the Agency's failure to approve

a relative's home for placement of the children. (*Ibid.*) The Agency contended the evidence was irrelevant because the court could not place the children in an unapproved home and the relative had a pending grievance proceeding with the Agency. (*Id.* at p. 29.)

On appeal, this court determined that the juvenile court should have admitted the evidence. (*N.V., supra*, 189 Cal.App.4th at p. 31.) Because the Agency could not predict how long the grievance proceedings would last, the juvenile court should have considered the evidence in order to provide meaningful review of the Agency's determination that the relative's home was unsuitable. (*Ibid.*) One of the circumstances animating this court's concern about the length of the grievance proceedings was the potential inapplicability of the relative placement preference after the disposition hearing, as stated in *Lauren R.* (*N.V.*, at p. 31.) As we have explained, we disagree with this interpretation of the relative placement preference. "[A]t least through the reunification period, when a relative voluntarily comes forward at a time when a new placement is *not* required, the relative is entitled to the preference and the court and the social worker are obligated to evaluate that relative . . . ." (*Joseph T., supra*, 163 Cal.App.4th at p. 794.)

The juvenile court therefore erred in determining that section 361.3 did not apply. Because the court had an erroneous understanding of the legal principles governing its decision, the court abused its discretion in denying Cameron's petition. (See *In re Y.M., supra*, 207 Cal.App.4th at p. 918; *In re B.D., supra*, 159 Cal.App.4th at p. 1228; *In re Shannon M., supra*, 221 Cal.App.4th at p. 289.)

III

Despite the juvenile court's erroneous determination that the relative placement preference did not apply to Cameron's petition under section 388, the Agency argues that any error was harmless because the court determined that placement with Cameron's mother, Beverly, was not

in Jaylen's best interests. In *Joseph T.*, for example, the court explained that "the record contains ample evidence that the [relative placement] preference was overridden in this case," and thus the juvenile court's failure to apply the preference was harmless. (*Joseph T., supra*, 163 Cal.App.4th at p. 798.) Similarly, the Supreme Court in *Stephanie M.* adopted the view that "regardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child . . . ." (*Stephanie M., supra*, 7 Cal.4th at p. 321.) Thus, "[t]he question before the juvenile court at the hearing on change of placement was, at bottom, to determine whether a change of placement was in the best interest of the child." (*Ibid.*) However, the Supreme Court in *Stephanie M.* did not consider a situation, as we do here, where the juvenile court was unaware that the relative placement preference applied. (See *Stephanie M.,* at p. 320 ["[T]he record does not indicate that the trial court refused to apply the relative placement preference at the hearing . . . ."].)

Under the circumstances of this case, as we shall explain, we cannot say that "ample evidence" showed that the relative placement preference was overridden or that there was no reasonable probability that the juvenile court would have reached a decision more favorable to Cameron had it been aware that the relative placement preference applied. (See *Joseph T., supra*, 163 Cal.App.4th at p. 798; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The best interests of a child " 'is an elusive guideline that belies rigid definition.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) However, "[p]lacement with a *suitable* relative is presumptively in the child's best interest. (§§ 309, 319, 361.3, subd. (a), 16000, subd. (a), 16501.1, subd. (c)(1).)" (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1060, italics added.) The evidence showed that Jaylen's foster father was an extraordinary caregiver and that Jaylen was thriving in his home. But the evidence also showed that Beverly was an energetic, able, and

14

caring individual to whom the Agency had already entrusted three young children. While the Agency initially had concerns about Beverly's ability to care for Jaylen in addition to his three half siblings, the Agency social worker responsible for Jaylen testified that further information about Beverly and her support system had resolved the Agency's concerns.

In reaching its decision here, the juvenile court noted its view that the relative placement preference was inapplicable. The court described Beverly as "a truly wonderful and caring grandmother" but emphasized that Beverly "has not had the opportunity to establish a relationship or a bond with Jaylen." The court explained, "At this stage, given the fact there is no relationship yet between [Beverly] or half[]siblings, it would be detrimental to change placement from the licensed foster home to the paternal grandmother, [Beverly]. [¶] The court is compelled at this time to deny the [section] 388 petition, based upon the case law and the evidence presented at this hearing." The court expressed disappointment with the Agency's delay in assessing Beverly for placement and its inadequate efforts in facilitating visitation between Beverly and Jaylen. In its brief to this court, the Agency "acknowledges its initial efforts to locate relatives early in the case appear to be less than diligent."

The Agency's failure to promptly contact and assess Beverly, and to give her a fair chance at placement, fell short of the Agency's obligations under section 361.3. (See § 361.3, subd. (a); see also *In re Antonio G.* (2007) 159 Cal.App.4th 369, 377.) "While we understand the urgency involved in securing a stable placement for dependent children, [the Agency] is required to give a fair chance to a relative seeking placement. The correct application of the relative placement preference places the relative 'at the head of the line when the court is determining which placement is in the child's best interests.' " (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033.)

15

Two weeks into Jaylen's dependency case, Cameron notified the Agency that he would like Beverly considered for placement. Once Cameron was confirmed to be Jaylen's father, at the latest, the Agency should have promptly contacted and assessed Beverly to give her a fair chance to obtain placement. (See Welf. & Inst. Code, § 309, subd. (e)(1); § 16000, subd. (a); Fam. Code, § 7950, subd. (a)(1); see also Welf. & Inst. Code, § 361.3.) However, the Agency social worker responsible for Jaylen did not contact Beverly at that time, nor did she contact Beverly after her colleague provided Beverly's contact information to her after Beverly's own inquiry. Only through Beverly's persistence in reaching Jaylen's social worker did the Agency eventually begin to consider placement of Jaylen with Beverly.

Given the Agency's failure to satisfy its statutory obligations, the evidence presented at the hearing, and the court's reliance on its determination that the relative placement preference did not apply, we cannot say that "ample evidence" showed that the relative placement preference was overridden or that there was no reasonable probability that the juvenile court would have reached a decision more favorable to Cameron had it been aware that the relative placement preference applied. (See *Joseph T., supra*, 163 Cal.App.4th at p. 798; *People v. Watson, supra*, 46 Cal.2d at p. 836; see also *Cesar V. v. Superior Court, supra*, 91 Cal.App.4th at p. 1033.) "Section 361.3 promotes a preference for foster placement with relative caregivers as set forth in Family Code section 7950 and helps meet 'the statutory requirement of section 16000 of the Welfare and Institutions Code that a child live in the least restrictive and most family[-]like setting possible.' " (*In re Antonio G., supra*, 159 Cal.App.4th at p. 377.) If the juvenile court had been aware of the application of section 361.3 here, we find it reasonably probable its decision on Cameron's petition would have been different.

16

We emphasize, however, that the relative placement preference does not *guarantee* placement with a relative. (*Joseph T., supra*, 163 Cal.App.4th at p. 798.) Nor does it create an evidentiary presumption that relative placement is in a child's best interests. (*Stephanie M., supra*, 7 Cal.4th at p. 320.) "The statute acknowledges . . . that the court is not to presume that a child should be placed with a relative, but is to determine whether such a placement is *appropriate*, taking into account the suitability of the relative's home and the best interest of the child." (*Id.* at p. 321.) We express no opinion regarding the merits of Jaylen's placement with Beverly and whether such a placement would be in Jaylen's best interests when properly considered under section 361.3. It may well be true that the interests of stability and continuity for Jaylen will prevail over familial bonds that, at least at the time of the juvenile court's hearing, were merely potential. (See *Stephanie M.,* at p. 317.) This question should be decided in the first instance by the juvenile court, however, under the governing legal standards. On rehearing, the juvenile court should consider the relevant facts regarding Jaylen's placement and Beverly's suitability, including the results of any additional visitation that may have occurred between Jaylen and Beverly.

DISPOSITION

Let a writ of mandate issue directing the juvenile court to vacate its March 14, 2014, order denying Cameron's petition under section 388 and to enter a new order directing the Agency to assess Jaylen's placement with Beverly under section 361.3. After the assessment is complete, the juvenile court shall hold a new hearing on Cameron's petition in accordance with the views expressed in this opinion.

The stay issued on June 26, 2014, is vacated.  Once the relative placement issue is heard and resolved, the juvenile court may reschedule its selection and implementation hearing under section 366.26.


NARES, Acting P. J.

WE CONCUR:


McINTYRE, J.


AARON, J.


18