Filed 4/19/13  In re G.A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re G.A. et al., Persons Coming Under the Juvenile Court Law. _____ | D062943 |
| SAN DIEGO HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J518-049 C/D) |
|     Plaintiff and Respondent, | |
|     v. | |
| GARY A. and JOSE N., | |
|     Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, David B.

Oberholtzer, Judge.  Orders affirmed as to Gary A., and reversed and remanded as to

Jose N.

Gary A. (Gary) and Jose N. (Jose) appeal from orders denying their respective

petitions to modify a previous order and terminating their respective parental rights under

Welfare and Institutions Code section 366.26.  (All undesignated statutory references are

to this code.)  Gary contends the juvenile court erred when it declined to find that the beneficial relationship exception of section 366.26, subdivision (c)(1)(A) applied to the relationship with his son, G.A.  Jose contends the juvenile court abused its discretion when it denied his section 388 petition requesting that the section 366.26 order be vacated and he be given six months of additional services.  Alternatively, Jose asserts the juvenile court erred when it declined to find that the beneficial relationship exception of section 366.26, subdivision (c)(1)(B)(i) applied to the relationship with his son, J.N.  As we explain below, we reject Gary's contentions, but reverse as to Jose.

GENERAL FACTUAL AND PROCEDURAL BACKGROUND

Mother has four children, J.N. (born 2009), G.A. (born 2007), F.U. (born 2006) and M.H. (born 2004), each with a different father.  In January 2011, the San Diego County Health and Human Services Agency (the Agency) received a referral that Mother had left the children with the maternal grandparents for days at a time and was not attending to their needs.  There were also concerns regarding Mother's lack of involvement and unwillingness to receive in-home services for F.U., who has autism.

In February 2011, Mother was arrested and incarcerated for possession of drug paraphernalia.  She did not attend a Team Decision Meeting and refused the Agency's offer of services.  The Agency filed separate petitions on behalf of the children.  The Agency detained the children and ultimately placed then in the home of the maternal grandmother.

2

DISCUSSION

I. *Gary's Appeal*

A.    Facts

In May 2011, Gary was arrested for testing positive for drugs, a parole violation, and was incarcerated until June 23, 2011, when he entered a residential substance abuse program. While at the program, Gary was allowed visits with G.A. By June 2011, Gary had completed a parenting program. In July 2011, the juvenile court held the jurisdiction and disposition hearing, found the petition true, removed custody from the parents, and ordered reunification services. In September 2011, Gary completed his substance abuse program and his drug test results were negative. His contact with G.A. was positive, and by November 2011, the social worker permitted unsupervised visits.

At the April 2011 six-month review hearing, the social worker recommended that Gary's reunification services be terminated because Gary had relapsed. The juvenile court terminated services and set a permanent plan hearing. In December 2011 and January 2012, Gary failed to submit to drug testing and stopped visiting G.A.

In the August 2012 permanent plan report, the social worker opined that G.A. was likely to be adopted because he was in good health, active and engaging. The maternal grandmother wanted to adopt G.A. and his three siblings. In September 2012, Gary filed a section 388 petition requesting visits and an additional period of reunification services. Gary stated that he had been residing in a program since being released from custody in August 2012, that he was drug testing negative and attending counseling. The juvenile court denied a hearing on the petition. In October 2012, Gary filed another section 388

petition, seeking an order vacating the permanent plan hearing and additional reunification services. Gary asserted that G.A. had a strong bond with him, and it was in the child's best interests to grant more services.

In November 2012, the court held a combined hearing on the permanent plan and the section 388 petition. The court granted a hearing on the section 388 motion and ruled the same evidence would be considered on the section 388 petition and the termination of parental rights. After argument, the court denied Gary's section 388 petition, and finding no statutory exception, terminated parental rights. Gary timely appealed.

B.     Analysis

Gary contends his parental rights should not have been terminated because of the beneficial nature of his ongoing relationship with G.A. (§ 366.26, subd. (c)(1)(B)(i).) We are not persuaded.

Parental rights may be terminated if there is clear and convincing evidence of adoptability (§ 366.26, subd. (c)(1)); however, an exception exists where a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship is one that promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parent must show that the parent-child relationship is such that the child will be greatly harmed by the termination of the parent's parental rights, so that the presumption in favor of adoption is overcome. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854.)

Implicit in this standard is that "a *parental* relationship is necessary for the exception to apply, not merely a friendly or familiar one. [Citations.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) The existence of this relationship is determined by taking into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) We review the juvenile court's ruling under the substantial evidence test (*ibid.*), viewing the evidence in the light most favorable to the prevailing party. (*In re J.I.* (2003) 108 Cal.App.4th 903, 911.)

Gary lived with G.A. until G.A. was six months old. Thereafter, Gary had weekly visits with his son. However, Gary was frequently in and out of jail with arrests in September 2009, July 2010 and November 2010, and the record is unclear whether he visited his son during this time period. Gary was released from jail near the end of January 2011, but the Agency detained G.A. the following month. In May 2011, Gary was again arrested and incarcerated until the end of June 2011, when he entered a residential substance abuse program. While in the program, Gary had consistent visits with G.A., with unsupervised visits scheduled to start November 2011.

Gary, however, stopped visiting G.A. in December 2011 and a report dated February 2012 indicated that his whereabouts were unknown. During this time period, the social worker reported that G.A. had not asked about his father and displayed no behavioral issues when visitation stopped. Ultimately, Gary contacted the social worker

at the end of August 2012 to request that visitation be reinstated. Visitation resumed in mid-September 2012 when G.A. was five years old.

This chronology shows that Gary had not cared for G.A. since G.A. was six months old and was primarily absent from his son's life until G.A. turned five years old. Gary enjoyed almost two months of visits with G.A. before the section 366.26 hearing took place at the beginning of November 2012. During these visits Gary played with his son and never acted inappropriately. G.A., however, parted easily from Gary at the end of the visits and there was no evidence that G.A. asked about Gary between visits. The social worker testified that while G.A. enjoyed his interaction with Gary, he had not seen G.A. spontaneously initiate any affection toward Gary. Rather, the social worker observed that G.A. viewed his maternal grandmother as an authority and parental figure and went to her for affection.

This record amply supports the juvenile court's conclusion that the benefits adoption would confer on G.A. outweighed the parent-child bond. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

## II. *Jose's Appeal*

A. Facts

At the end of April 2011, the Agency learned that Jose was an inmate at Acton Conservation Camp (ACC), a fire camp, but that he was not allowed to make telephone calls. In July 2011, the juvenile court held the jurisdiction and disposition hearing, found the petition true, removed custody from the parents, and ordered reunification services. In a letter to the Agency received in November 2011, Jose requested visits with J.N.,

stating ACC had a nice visiting area where he could play with J.N. The social worker, however, did not believe visits were appropriate, due to the distance, facility conditions, and inability of the maternal grandmother to drive the distance with all the children. In January 2012, the court ordered that Jose be provided with funds to make collect calls to the caretaker and his son, of which he took advantage.

At the April 2012 six-month review hearing, the juvenile court stated it was aware that ACC provided no services of any kind to inmates. Nevertheless, it found that the Agency had provided reasonable services, it terminated reunification services and set a permanency planning hearing. The June 2012 section 366.26 report indicated that J.N. was considered to be adoptable, that he had a strong attachment to his caregivers and siblings, and that the maternal grandmother had begun the adoption home study process. Jose telephoned every week or two, speaking with J.N. and the half-siblings. In August 2012, the court granted Jose's request to continue the contested permanency planning hearing to allow Jose to file a section 388 petition.

In his section 388 petition, Jose requested that the court vacate the permanency planning hearing and order six months of reunification services. While at ACC, Jose had been an excellent worker, disciplinary free, entrusted with additional responsibilities and drug tested monthly with negative results. Within days of his release from ACC in early August 2012, Jose enrolled in a program of drug and parenting counseling. He also obtained employment in an auto body shop. After his release, he visited J.N. consistently. The court found that Jose had established a prima facie showing and set a hearing on the merits.

At a combined modification and permanency planning hearing in November 2012, the social worker testified that granting the section 388 was not in J.N.'s best interest as Jose did not have a long enough period of sobriety or freedom from criminal activities and the minor needed permanency. The juvenile court denied the section 388 request, finding that Jose's circumstances had changed, but it would not be in J.N.'s best interest to grant the request. The court found J.N. to be adoptable and terminated parental rights, finding that Jose had not proved that J.N. fell within the section 366.26, subdivision (c)(1)(B)(i) exception to the termination of parental rights.

B.      Analysis

Jose asserts the juvenile court abused its discretion in denying his section 388 petition to vacate the permanent plan hearing and grant him additional reunification services. We agree.

Section 388 serves as "an 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528, citing *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Under this statute, a parent may petition the court to change, modify, or set aside a previous court order on the grounds of changed circumstances. (§ 388, subd. (a).) The parent must show both a change of circumstances and that the modification would promote the child's best interests. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) In considering a request for a change of placement at the permanency planning stage, the juvenile court must recognize that the focus has shifted to the child's need for permanency and stability.

8

(*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) On appeal, the juvenile court's ruling will not be disturbed absent a clear abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) The "scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . . [Citations.]" (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 (*City of Sacramento*).) A judicial determination that falls outside the applicable principles of law constitutes an abuse of discretion. (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119.)

As the juvenile court correctly found, Jose's circumstances had changed. Jose testified that he had a long criminal history and that he had been arrested about ten times. His drug of choice had been methamphetamine. During his 17 months at ACC, Jose was disciplinary free and had become a reliable worker, "who has been entrusted with additional responsibilities above normal expectations." Jose tested negative on mandatory, monthly drug and alcohol tests. Jose regularly attended weekly ministry services. He was described as "punctual, honest, trustworthy, and responsible for his actions."

Immediately upon his release from ACC, Jose obtained employment and housing. His employer described Jose as a "very hard worker." He also independently signed up for parenting and outpatient drug treatment, and had completed most of the parenting classes at the time of the section 388 hearing. Jose actively participated in a drug treatment group and 12-step meetings. All drug tests taken by the program were negative.

9

At the time of the hearing, Jose had been clean and sober from all drugs and alcohol for 23 months. Additionally, since his release in August 2012, he has been a law abiding citizen. Jose stated that being in the fire camp and working hard helped him become a law-abiding citizen. Jose explained that the religious services and Bible studies helped him in his sobriety because they "helped me form a foundation of better moral standards for myself and for bringing up my son." He felt the church services gave him "a whole new outlook," in terms of what he thought was right or wrong.

Turning to the best interests prong, the factors to consider in ruling on a section 388 petition include: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.)

On the first *Kimberly F.* factor, it was the Mother's neglect of the children that led to the dependency. J.N. was 21 months old when he was detained. Jose's criminal records suggest he was incarcerated most of this time prior to J.N.'s detention. Starting one month after the detention hearing, Jose was an inmate at ACC for 17 months. In essence, Jose was a non-offending, noncustodial parent who was ordered to participate in reunification services due to his past record. Notably, Jose entered ACC shortly after the juvenile court ordered reunification services for Jose and was still an inmate when the court terminated his services. This factor favors Jose because the record is undisputed

10

that Jose was drug free and a model citizen while at ACC and that Jose remained so at the time of the hearing.

The third *Kimberly F.* factor relates to the degree to which the problem may be easily removed or ameliorated and the degree to which it actually has been. (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) While the Mother's conduct led to the dependency, it is undisputed that Jose had a history of crime and drug abuse. As detailed above, Jose through his own initiative and without *any* assistance from the Agency, has made extraordinary progress in ameliorating his problems, if not eliminating them entirely. We rarely see a parent that has independently undertaken such efforts to reunite with a child. This factor strongly favors Jose.

The second *Kimberly F.* factor required the court to evaluate the strength of the relative bonds between the dependent child and his or her parent, compared with the strength of the child's bond to his or her present caretakers. (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531.) In considering this factor, the bond to the caretaker cannot be dispositive, lest it create its own self-fulfilling prophecy. (*Ibid.*) Here, although Jose and J.N. enjoyed only about two months of visitation after Jose's release from ACC, the visitation logs show that Jose consistently demonstrated a parental role and knowledge of the child's development, responded appropriately to his child's verbal and non-verbal signals, put his child's needs ahead of his own, and showed empathy towards his son. The visitation monitor noted that Jose was very patient with his son. J.N. referred to Jose as his "daddy" and had difficulty ending some of the visits. During one difficult parting, the visitation monitor noted that Jose's interaction with his son was "great" and that Jose

11

talked J.N. through everything and was very attentive. The social worker did not assess whether a significant parent-child relationship existed between Jose and J.N. because there were too few visits to make that assessment. Nonetheless, the social worker admitted that the relationship was "growing."

On the other hand, it was undisputed that J.N. had a strong relationship with his current caregiver, the maternal grandmother, and his half-siblings. The juvenile court concluded that reunification or offering Jose additional services was not in J.N.'s best interest because "developing a closer [parent-child] bond would not outweigh the detriment of severing the bond" between J.N. his caregiver and half-siblings. The record, however, does not support the juvenile court's assumption that giving Jose an additional period of reunification services to foster the developing parent-child relationship would ultimately lead to the severance of J.N.'s relationship with his caregiver and half-siblings. Rather, should his section 388 petition be granted, Jose intended to continue contact between J.N. and those relatives. Jose testified that he has known the maternal grandmother for several years and was on a friendly basis with her. He also "very much" loved J.N.'s half-siblings and spoke to them on the telephone.

Put simply, granting the section 388 petition, vacating the permanent plan hearing and providing Jose additional reunification services would not automatically lead to the severance of J.N.'s close bonds with his caregiver and half-siblings. Even in the best case scenario where the court orders reunification and terminates its jurisdiction over J.N., it may enter visitation orders that will be transferred to an existing family court file, or visitation orders that may be used as the basis for opening a superior court file. (*In re*

*Hirenia C.* (1993) 18 Cal.App.4th 504, 518-519; see generally, § 362.4.) This record suggests the juvenile court erred in applying the standards for relief under section 388 to Jose's unique situation. (See *City of Sacramento*, *supra*, 207 Cal.App.3d at pp. 1297–1298 [an abuse of discretion occurs not only where the court's action "was utterly irrational," but also where the court "is mistaken about the scope of its discretion . . . [I]f the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law"].)

Accordingly, we conclude the juvenile court abused its discretion in denying Jose's section 388 petition, and in failing to order additional services. Our conclusion that the juvenile court abused its discretion in denying Jose's section 388 petition renders moot his alternative argument regarding the beneficial relationship exception. Additionally, the reversal of the order on the section 388 petition requires the reversal of the judgment terminating parental rights. (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 861.)

DISPOSITION

We affirm the orders of the juvenile court as to Gary. We reverse the order denying Jose's section 388 petition, and consequently, the order terminating Jose's parental rights is also necessarily reversed. As to Jose, the matter is remanded to the juvenile court for further proceedings consistent with this opinion.


McINTYRE, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.

14