Filed 9/19/13  In re A.N. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.N. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E057901 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J243007 & J243008) |
| v. | OPINION |
| F.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Dismissed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent.

1

## I. INTRODUCTION

F.A. (father) appeals from placement orders made following the hearing under Welfare and Institutions Code[1] section 366.26 hearing at which his parental rights were terminated as to A.A. (born in April 2004) and A.N. (born in September 2005). Father contends the juvenile court erred in refusing to conduct a hearing to assess the children's placement with a relative caretaker under section 366.26, subdivision (k).[2][3]

CFS contends father lacks standing to raise placement issues, and we agree. We will therefore dismiss the appeal.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. Prior Proceedings

In 2008, A.A., A.N., and their half sibling, C.N.[4] were made dependents of the juvenile court and removed from their parents' custody based on allegations of substance abuse and neglect. Father had been arrested in 2005 and remained in custody. He was

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] "[T]he application of any person who, as a . . . foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being." (§ 366.26, subd. (k).)

[3] In his opening brief, father appeared to rely on the relative placement preference set forth in section 361.3. In his reply brief, he clarifies that his argument is based solely on section 366.26, subd. (k).

[4] This appeal does not involve C.N., who has a different father.

convicted of attempted murder, and in February 2009, he was sentenced to 105 years to life in prison.

In July 2009, P.N. (mother)[5] gave birth to the children's half sibling D.N., who remained in her care because she was successfully completing services. In November 2009, the children were placed with mother under a family maintenance plan. In May 2010, the prior dependency proceedings were dismissed.

## B. Current Proceedings

San Bernardino County Children and Family Services (CFS) filed new dependency petitions in February 2012 after mother's new live-in boyfriend beat and kicked D.N. to death in front of the other children. The petitions alleged that father was unable to provide for A.A. and A.N. because of his incarceration.

On February 23, 2012, the children were ordered detained. Father's sister, D.A., was present at the hearing and requested placement of the children with her. The juvenile court authorized placement with D.A. upon approval by the Relative Approval Unit (RAU).

On March 15, 2012, CFS filed a jurisdictional/dispositional report recommending that none of the parents receive reunification services and that a section 366.26 hearing be scheduled.

---

[5] Mother is not a party to this appeal.

A.A. and A.N. told the social worker they did not want to live with any family member. K.M., a distant maternal cousin,[6] and her husband also requested placement of the children. The M.'s lived in Arizona, and CFS asked the court to initiate proceedings under the Interstate Compact on Placement of Children (ICPC). Both the M.'s and D.A. wanted to adopt the children.

The jurisdictional/dispositional hearing was conducted over several sessions. On March 21, 2012, the social worker reported that D.A. was being assessed for placement of the children. The children had told the social worker they did not want to visit with any family members except their grandfather. The juvenile court authorized CFS to "assess relatives as appropriate and to provide an update at further hearing." The court ordered relatives "to not discuss the petition, its content, underlying facts or future placement with the child(ren)."

On March 21, 2012, A.A. and A.N. had a visit with the M.'s. The visit went well, and another visit was scheduled for two days later. A.A. told her foster mother that she did not want to visit again. She later said, "[T]hey are nice but I don't want to live with them, I want to stay where I'm at." On May 9, A.A. was told she was going to visit with D.A., and A.A. responded that she did not know who that was.

CFS filed a first addendum report on April 17, 2012. The social worker reported that the children had not expressed an interest in visiting with parental relatives. D.A.'s assessment by the RAU was still pending.

---

[6] K.M. explained that the children's great grandmother was K.M.'s aunt and their grandfather was her cousin.

At the continued jurisdictional/dispositional hearing on April 24, 2012, the social worker reported that D.A. was still being assessed, and an exemption[7] was pending. The court authorized placement with D.A. upon RAU approval.

CFS filed a second addendum report on June 6, 2012. The social worker stated that D.A.'s assessment had been discontinued on May 9 because a woman who resided in D.A.'s home had not provided a criminal disclosure statement. D.A. had been notified of the reason for the discontinuance. At a hearing on June 11, D.A. denied that anyone else had been living in the home.

CFS filed a third addendum report on June 15, 2012. The social worker again stated that the relative assessment for D.A. had been discontinued because a form for the babysitter was missing. CFS did not recommend approval for D.A. because the bedrooms were too small for the number of children already in the home before the placement of these children, and D.A.'s weekly visits had been inconsistent. At a hearing on June 20, counsel for CFS repeated that CFS "would not be recommending [D.A.] irrespective of R-A-U approval."

CFS filed a fourth addendum report on July 5, 2012. The social worker again reported that D.A. had been approved and the RAU would provide bunk beds for the children. D.A. was willing to have the children placed with her, and she agreed to follow CFS rules in regards to visitation with the parents and other relatives. CFS continued to have misgivings about the placement because D.A. appeared to act more as a friend to the

---

[7] D.A. had six misdemeanor convictions.

5

children than as a parent, and the children had "vast needs." However, the children's foster mother had notified CFS that she was moving and would no longer be able to care for the children, and CFS recommended they be placed with D.A. The children had told the social worker they did not trust any family members because the family members never protected them. The juvenile court authorized placement of the children with D.A. on July 9, 2012.

At the hearing on August 1, 2012, the social worker was asked if she recommended placement of the children with D.A. She responded, "At this time. I am not totally comfortable with it being the concurrent planning home, but at this time the children appear to enjoy the aunt. There is some question on ability to parent with so many children, and these children are going to need extensive therapy. They have had a lot of trauma." The social worker recommended that D.A. take a parenting class as a condition of keeping the children.

On August 2, 2012, the juvenile court found the allegations of the petitions true. The court denied reunification services to mother and father. The court ordered the matter set for a section 366.26 hearing.

CFS filed a section 366.26 report on November 21, 2012. CFS requested that the section 366.26 hearing be continued for 120 days while the M.'s were being evaluated as prospective adoptive parents in Arizona. The report stated that the children had been placed with D.A. on July 9.

At the hearing on November 30, 2012, D.A. was admonished not to discuss the dependency case with the children. Both D.A. and the M.'s stated they wished to adopt the children. K.M. reported that the ICPC proceedings with Arizona had begun in August and were in the final stages.

CFS filed an addendum report on December 20, 2012. The report stated that the children continued to live with D.A. The social worker had received an ICPC license application status report confirming that the application of the M.'s was in process. The social worker had spoken with a licensing worker in Arizona, who stated she had recommended approval of the M.s' license and that the process would be complete in early January 2013. The social worker stated she had received a lengthy report from K.M of the children's visits with the M.'s. The social worker concluded it was "obvious that the children have attached with the M[.] family" and were comfortable with them. The social worker also stated that K.M. had reported several incidents in which the children disclosed, among other things, that D.A. had left A.A. "'in charge when she went to work one day and [A.A.] bathed [C.N.] and fed them all breakfast," and that the children had attended their mother's recent wedding. The social worker concluded, "It is apparent that Aunt [D.] has not been protective of the children in that she took them to the mother's wedding violating Court Order of 'No contact with mother.' It is in the children's best interest to be placed for adoption with the prospective adoptive parents, Mr. and Mrs. M."

At the section 366.26 hearing on December 28, 2012, father's counsel stated that father opposed placement of the children with relatives in another state. Counsel stated that D.A. denied allowing the children to attend a wedding at which they had seen their

mother.  Counsel for the children responded, "My understanding is that it was the mother's wedding, and they were there."  She stated the children had described the wedding.  Counsel for the children further stated, "Based on the information in today's report, I will advise the Court that in speaking with the children this morning they are reporting they would like to stay with [D.A.].  Their visits with their cousin, the cousins, are good, but that is their preference.  But we do, based on the information, believe it is in their best interest to be placed with the Arizona relatives."

The court inquired of A.A., "I was told you went to a wedding.  [¶]  Did you have a good time?"  A.A. responded, "Yes."  The court asked, "Who got married?"  A.A. responded, "My mom."  However, A.A. also responded that she did not know who her mother had married or what her mother was wearing, and that she did not have flowers.  A.A. then said she had never gone to a wedding and had not gone anywhere with her mom.

The court held an off-the-record discussion in chambers.  When the hearing resumed, father's counsel stated, "At this point, my client is opposed to moving the children.  It is his position that the children should remain with the paternal aunt [D.A.] who they currently are with.  I believe that he would state that it is in the children's best interest to remain with relatives that they are familiar with, and as indicated earlier, I think by their attorney that they do wish to remain with [D.A.], the paternal aunt.  So at this point, I would be opposed to moving the children, and I am asking for a hearing regarding the change of placement."  The children's counsel again stated that although the children stated their preference for staying with D.A., counsel "believe[d] based on

8

their disclosures today, and in the recent past, in regards to contact with their mother at a wedding, that it is not in their best interest to remain in the current placement. Clearly the relative is not willing to follow Court orders and is not protective and is not keeping the children in a safe situation. [¶] The children have had some visits, some substantive visits with the relatives who are being assessed pursuant to ICPC by the State of Arizona, and based on the reporting of those visits, we believe that that relative placement is in their best interest and would ask that the children are placed accordingly." Counsel for CFS objected to the request for a hearing on placement on the ground that the matter was at the termination stage under section 366.26, and placement was governed by the best interest of the children. Counsel for CFS agreed with counsel for the children that their best interest lay in placement with the maternal cousins in Arizona.

The juvenile court denied father's request for a continuance of a hearing on placement. The juvenile court found that the children were adoptable, terminated parental rights, and set adoption as their permanent plan.

The juvenile court then turned to the issue of placement. The court stated that the ICPC for the M.'s was ongoing, and the M.'s had attended court hearings several times. The court continued: "The Court did have a conference with the children in chambers with all counsel present. [¶] For the record, the children demonstrate and exhibit classic signs of evasion. They're scared to death of telling the truth about what is happening in their home life. It is quite sad, especially based on what they have already been through watching their sibling killed, and the caregivers should be ashamed of themselves for further placing a burden on little kids that shouldn't have been placed at all. [¶] The

9

children did attend a wedding. The children have had contact with their mother in direct violation of the Court order. And since the Court has constantly been evaluating out-of-state relatives, I have been advised they have received their license for a family foster home. They have been approved. ICPC is ongoing. So at this point, it is the Court's intention to give an extended visit of the three children with the Arizona relatives and see how that goes. The social worker will evaluate how that placement is going, and if it goes well, and the children are happy, they're evaluated for prospective adoption."

## III. DISCUSSION

CFS contends father lacks standing to raise placement issues. As we discuss below, we agree.

In *In re K.C.* (2011) 52 Cal.4th 231 (*K.C.*), the juvenile court denied the request of paternal grandparents that the child be placed with them, terminated the father's parental rights, and ordered adoption as the child's permanent plan. (*Id.* at p. 235.) The father appealed the order denying placement with the grandparents. Our Supreme Court affirmed the Court of Appeal's order dismissing the appeal, holding that the father lacked standing because he was not personally aggrieved by the juvenile court's order. The court explained that until parental rights are terminated, all parents have a compelling interest in the companionship, care, custody, and management of their children. Thus, when dependency proceedings begin, the law's first priority is "to preserve family relationships, if possible." (*Id.* at p. 236.) However, "after reunification services are terminated or bypassed (as in this case), 'the parents' interest in the care, custody and companionship of the child [is] no longer paramount. Rather, at this point "the focus

10

shifts to the needs of the child for permanency and stability . . . .'" [Citations.]" (*Ibid.*) The court stated that when the father did not argue that any exception to terminating parental rights existed, it logically followed "[t]hat he ha[d] no remaining, legally cognizable interest in [the child's] affairs, including his placement . . . ." (*Id.* at p. 237.)

The court stated the following rule: "A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights. This rule does not support father's claim of standing to appeal because he did not contest the termination of his parental rights in the juvenile court. By thus acquiescing in the termination of his rights, he relinquished the only interest in K.C. that could render him aggrieved by the juvenile court's order declining to place the child with grandparents." (*In re K.C.*, *supra*, 52 Cal.4th at p. 238, fn. omitted.) The court therefore affirmed the dismissal of the appeal for want of standing. (*Id.* at p. 239.)

Father contends *K.C.* is distinguishable because in that case the juvenile court denied the grandparents' petition under section 388 seeking placement of the child in their home *before* the court selected adoption as the child's permanent plan. (*K.C.*, *supra*, 52 Cal.4th at p. 235.) He argues that because he was the one who requested the hearing on caretaker placement, he was aggrieved by the denial of that request. However, father has not shown that he comes within the rule set forth in K.C., under which he must show that the reversal of the juvenile court's order would "advance[e his]

11

argument against terminating parental rights" (*id*. at p. 239) because he makes no such argument.

He further argues that if he is denied standing, no one would have standing to raise the issue of denial of the caretaker placement preference. Again, we disagree. First, D.A. could have sought de facto parent status. Second, counsel for the children could have raised the issue if he believed it was meritorious. In *In re Lauren R*. (2007) 148 Cal.App.4th 841, 845, the court acknowledged that both a de facto parent and the child had standing to contest the failure to apply the caretaker preference under section 388.26, subdivision (k).

Father relies primarily on *In re Lauren R.*, *supra*, 148 Cal.App.4th 841, but that case is not helpful to his position. Although the court reversed an order terminating parental rights, it did so only to restore all parties to their prior positions, and its disposition order provided that after the juvenile court held a placement hearing, "the court shall reinstate its orders terminating parental rights . . . ." (*Id.* at p. 861.) Thus, the case does not suggest that the father independently had standing to raise the placement issue.

We conclude father lacks standing to raise the issue of relative placement.

## IV. DISPOSITION

The appeal is dismissed.

HOLLENHORST, Acting P. J.

We concur:

MCKINSTER, J.
MILLER, J.