Filed 2/27/15  In re C.P. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re C.P., JR., a Person Coming Under the Juvenile Court Law. | B258877 (Los Angeles County Super. Ct. No. CK44845) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.P., SR., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stephen Marpet, Juvenile Court Referee.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

C.P. (Father) challenges a juvenile court order relating to his son, C.P., Jr., on the grounds that the court should have granted a continuance and prematurely terminated parental rights. (Welf. & Inst. Code, §§ 352, 366.26.)[1] Good cause for a continuance was not shown. The court properly terminated parental rights because C.P. is going to be adopted and no exception applies. We affirm.

## FACTS

C.P. was detained at birth in June 2013, when he and his mother Charmica C. (Mother) tested positive for cannabinoids. Mother admitted using marijuana throughout her pregnancy, as recently as two days before C.P. was born, and for the past 13 years. Mother has children ages five, six and 10 who were the subject of referrals for abuse, neglect, caretaker absence/incapacity, and domestic violence. They live with the maternal grandparents and Mother has not visited them for years.[2]

C.P. was taken into protective custody by the Department of Children and Family Services (DCFS). Paternal grandmother Eva L. (PGM), who lives in Nevada, expressed willingness to care for C.P. and was given information about how to participate in the dependency process. Father could not take custody because he was incarcerated.

DCFS filed a petition alleging that C.P. was born suffering a detrimental condition—a positive toxicology test for marijuana—due to Mother's unreasonable acts. Mother has a history of drug use and currently abuses marijuana, rendering her incapable of providing regular child care and placing C.P. at risk of harm. On June 18, 2013, the juvenile court found a prima facie case for detaining C.P.; a substantial danger required removal from parental custody. Father was not present at C.P.'s birth, did not sign the birth certificate, was not married to Mother, and did not contribute financially toward the child's support; however, a paternity test showed a 99.99 percent probability that he is C.P.'s father.

---

[1]    Unlabeled statutory references are to the Welfare and Institutions Code.

[2]    Mother and her older children are not parties to this appeal. Father is not related to the older children.

In an amended petition filed in August 2013, DCFS re-alleged the charges against Mother and added an allegation that Father has a history of drug abuse and currently abuses marijuana, which places C.P. at risk of harm. The parents denied the allegations. C.P. was placed in foster care with the H. family, although the court gave DCFS discretion to place him with any appropriate family member. C.P. was rigid, fussy and appeared to be suffering from drug withdrawal symptoms.

When interviewed for the jurisdiction/disposition report, Mother admitted to smoking marijuana daily during her pregnancy, against the advice of her physicians. Asked why she continued to use marijuana, knowing it posed a danger to her unborn child, Mother replied that her concern was keeping her appetite and weight up. She stated that Father has used marijuana since at least 2010, when they began dating. He smokes marijuana daily, and is incarcerated for felony sales of marijuana. Mother identified a need for parenting classes, counseling, housing and job training.

Father was interviewed at his place of incarceration. He knew that Mother uses marijuana "recreationally" to reduce nausea, including during her pregnancy. Father agreed that "I do use marijuana" because he, like Mother, suffers from nausea, which he attributes to medication he takes for high blood pressure. Father has used marijuana for about 20 years, "all the time." He had a medical marijuana card, but cannot recall the name of his doctor. Father saw no need for DCFS intervention.

Father appeared, in custody, at the adjudication hearing on September 23, 2013. The court sustained allegations against both parents. As to Father, the sustained count states that he "has an extensive history of illicit drug abuse, and is an abuser of marijuana," rendering him incapable of providing regular care and endangering C.P.'s health and safety. C.P. was declared a dependent of the court. The parents were given reunification services and monitored visits. Father was ordered to participate in a drug program with random weekly testing, a parenting class, and individual counseling.

Father declined to enroll in a drug program offered in jail. Mother took one drug test, in June 2013, and tested positive for cannabinoids, morphine and opiates; she skipped 17 subsequent tests from July to December 2013. She attended 23 visits with

C.P., cancelled or failed to show up for many other visits, and ceased visiting in November 2013.

Father was released from jail, but did not contact DCFS. He received the minute order regarding the case plan and a list of referrals, but did not enroll in anything. Father had a single visit with C.P., on January 24, 2014. Though neither parent made any effort to comply with the case plan, they wanted C.P. to be returned to their care, not adopted. The court gave the parents notice in March 2014 that it intended to terminate reunification services due to lack of compliance with the case plan.

C.P. was thriving with the H. family and learning to crawl, stand up and shake his head. The foster parents reported that C.P. is relaxed and comfortable in their home, and shows positive signs of attachment. He recently entered the separation anxiety stage when apart from the foster parents, and is very attached to the three other children in the home. He is joyful and laughs out loud. They are willing to adopt C.P. The foster parents were denied status as de facto parents.

In March 2014, the social worker spoke to the PGM, who "said she previously did not want him placed in her home because she resides in Las Vegas and she thought [C.P.] would be with his mother by this court hearing. PGM said she is willing to provide a permanent home by adopting [C.P.]." Because the parents were not complying with court orders and not bonding with C.P., the social worker recommended that reunification services be terminated and that C.P. be placed with the PGM in Las Vegas, who could give him a permanent home and family ties. The court directed DCFS to initiate an interstate placement for the PGM.

In May 2014, DCFS reported that the parents had not shown that they enrolled in court-ordered programs. Father did not visit C.P., and neither parent contacted DCFS for five months. The social worker finally went to Mother's home. Mother wanted to reunify with C.P. and did not want him in Las Vegas because it is too far away. The court terminated reunification services for lack of parental compliance, set a section 366.26 hearing, and directed DCFS to investigate a permanent placement for C.P.

4

The caregivers asked to be identified as prospective adoptive parents, noting that C.P. has resided with them since he was three days old. The foster agency stated that C.P. is doing well with the H. family, exhibiting "age-appropriate separation anxiety which shows that he is securely attached to his caregivers." He knows several words, interacts well with the H.'s three adopted children, and is an integral part of the family, with whom he is bonded. None of C.P.'s relatives have ever visited him, and his parents stopped visiting as well. An adoption home study was approved for the H. family.

DCFS reported that C.P. is "very attached to the [H.] family and his foster siblings." Mother and Father have not visited C.P. in three months. The PGM "has never met [C.P.] She stated that she was not aware that she could make any contact with the child." Upon hearing that he was going to be adopted she started to attend court hearings; however, she has never shown any interest in having visits or contact with C.P. The PGM received directions from Nevada authorities to purchase a toddler bed and electrical outlet safety plugs. She expressed love for C.P. and excitement at the prospect of his placement with her. The PGM is not in contact with Father, but knows that he uses drugs. She has adopted two children by her daughter, both of whom suffered the effects of prenatal drug exposure. The PGM "would prefer that neither of the biological parents have contact with [C.P.] unless it is court ordered," due to their history of drug abuse. DCFS requested additional time to assess the PGM's home. The state of Nevada approved the PGM as a suitable placement for C.P.

The permanent plan hearing was held on September 12, 2014. Neither Father nor Mother attended the hearing. DCFS asked the court to terminate parental rights, but await the results of the interstate investigation on the PGM, noting that there is an approved home study for the H. family. The court denied the request of Father's attorney to set the matter for a contest: the lack of parental visitation mooted any need to inquire about the strength of a parent-child bond.

The court found by clear and convincing evidence that C.P. is going to be adopted and terminated parental rights. The court identified the permanent plan as adoption and declared the H. family to be the prospective adoptive parents. With respect to placement

5

the court stated, "this is a child that has been placed with the current caretakers since the child was three days old and it's clearly in the minor's best interest to remain in this location with these caretakers." Father appeals.

## DISCUSSION

### 1. Denial of a Continuance

Father contends that the court abused its discretion by refusing to continue the permanent plan hearing after DCFS asked the court to await the final results of an investigation of the PGM's home in Las Vegas. Father claims he was prejudiced because if DCFS were given more time to place C.P. with the PGM, Father could have avoided termination of his parental rights by asserting an exception to adoption.

A dependency hearing may be continued upon a showing of good cause, so long as it is not contrary to the child's best interests. "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a).) Written notice must be filed two days before the hearing, supported by declarations detailing why a continuance is necessary, unless the court for good cause entertains an oral motion. (*Ibid.*)

Father did not make a written request for a continuance two days before the hearing or an oral request at the hearing. DCFS and C.P.'s counsel urged the court to terminate parental rights. Father's attorney asked the court to set the matter for a contest, because "there is information that the parents have been visiting." The court refused to conduct a contested hearing owing to the woeful lack of parental visits. Neither parent asked for a continuance to effectuate a placement with the PGM. Father has forfeited the issue of a continuance by failing to ask the juvenile court for one.

Even if Father had made a motion for a continuance, there was no basis to grant it. Continuances are discouraged, and an appellate court cannot overturn the denial of one unless an abuse of discretion is shown. (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 810-811.) Here, there was no "good cause" for a continuance. (§ 352.) Father made no effort to participate in a drug program with random testing or visit C.P. His reunification

6

services were terminated four months earlier for lack of compliance.  Termination of parental rights was inevitable because C.P. was going to be adopted, the parent-child bond exception did not apply and the child would not be "greatly harmed" if parental rights were terminated.  (§ 366.26, subd. (c)(1)(B)(i); *In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854.)  Indeed, it is not clear that C.P. knows who Father is.  Under the circumstances, the court did not exceed the bounds of reason by proceeding with the hearing to terminate parental rights.  C.P. could still be removed and placed with the PGM, if it were found to be in the child's best interests.  (§ 366.26, subd. (n)(3)(B).)

## 2. The "Relative Exception" to Adoption Does Not Apply

Father contends that termination of his rights "was premature" because it deprived him of the opportunity to assert "the relative exception to adoption."  The court must terminate parental rights if the child cannot be returned to his parents and is likely to be adopted, *unless* "[t]he child is living with a relative who is unable or unwilling to adopt the child . . . but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child."  (§ 366.26, subd. (c)(1)(A).)  Father agrees that C.P. will be adopted.

On its face, the exception cited by Father is inapplicable.  C.P. has spent his entire life with the H. family.  The statutory provision that "removal of the child from the custody of his or her relative would be detrimental" has no relevance, given that C.P. has never lived with a relative.  The PGM did not visit C.P. despite knowing from the start that he was detained for his safety.  C.P. and the PGM are kin but have no emotional bond.  The "relative exception" does not apply for a second reason:  the PGM wished to adopt C.P., not be a legal guardian.

Father cites section 361.3, which states that "[i]n any case in which a child is removed from the physical custody of his or her parents . . . preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ."  (See *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1049-1051 [challenging a child protective agency's refusal to place a newly detained child with a

7

relative who had a criminal record].) The preference for relatives does not apply at the permanent plan hearing, long after detention and disposition—and after reunification services are terminated—at the tail end of the dependency process.

"Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests." (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.) "[T]he fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 321.)

The Legislature has specified a preference for the child's caretakers at the final stages of the proceeding. "[T]he application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caregiver or foster parent would be seriously detrimental to the child's emotional well-being." (§ 366.26, subd. (k).) The preference for caretakers is triggered when there is an intent to place the child for adoption, even before parental rights are terminated, due to the child's interest in remaining in a stable home. (*In re Lauren R., supra,* 148 Cal.App.4th at p. 856.)

Adoption home studies were completed for the H. family and for the PGM in Nevada, showing an intent to place C.P. for adoption. Father does not deny that adoption is the correct permanent plan. At this stage, the legislative preference for the caretakers applies. The court expressly found that C.P. has lived with the H. family since he was three days old, and "it's clearly in the minor's best interest to remain in this location with these caretakers." The record showed that after 15 months, C.P. was completely bonded with the foster parents and their three children, and considers them his family. Disrupting C.P.'s life-long emotional bonds to have him live with a stranger—even if the stranger is

8

a blood relative—would not be in his best interests.  There is no preference for the PGM, who has not been a part of C.P.'s life, and the court could not apply the "relative exception" to a relative who has never lived with the dependent child.  (§ 366.26, subd. (c)(1)(A).)  The court did not prematurely terminate parental rights and it properly identified the foster caregivers as the prospective adoptive parents.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                                    BOREN, P.J.

We concur:


        CHAVEZ, J.


        HOFFSTADT, J.