Filed 6/18/26  In re I.C. CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re I.C., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH & HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. Monica R. et al., Objectors and Appellants. | A173641 (Solano County Super. Ct. No. J45610) |

I.C., who will soon be four years old, was removed from parental custody shortly after his birth. In June 2024, the juvenile court terminated the parental rights of I.C.'s parents and ordered a permanent plan of adoption. This appeal pertains to an unsuccessful petition filed by I.C.'s paternal grandmother and aunt (appellants) after parental rights were terminated, which requested that the court change its prior order approving I.C.'s placement with his prospective adoptive parents. (Welf. & Inst. Code, § 388; statutory references are to this code.) The juvenile court found that the Solano County Health & Human Services Department (the Department) failed its obligation to give priority consideration to placing I.C. with family.

1

However, it concluded that maintaining I.C.'s placement in the only home he had ever known, with the family who intends to adopt him, serves the best interest of the child. We agree on both points and will affirm.

## BACKGROUND

### *Proceedings Prior To Termination of Parental Rights*

Facts culminating in the order terminating the parental rights of I.C.'s parents are set forth in *In re I.C.* (Jan. 31, 2025, A170828, A170916) [nonpub. opn.] (*IC I*). We briefly summarize those facts to provide context for our review.

When I.C. was born in July 2022, his mother C.C. (Mother) tested positive for fentanyl and cocaine. I.C. was removed from his parents' custody and placed in the foster care home where he would remain throughout the dependency. In February 2023, I.C. was declared a dependent after the court sustained allegations that Mother's substance abuse impaired her ability to care for I.C. and put him at substantial risk of harm. The court also found it would be detrimental to place I.C. with F.O. (Father). Reunification services were ordered for both parents.

At the six-month status review in August 2023, the court terminated Mother's reunification services and continued services for Father. By that time, I.C. had been referred to the North Bay Regional Center because he was experiencing developmental delays. When the 12-month review was held in October 2023, Father was unemployed, living in his car, and had refused service referrals intended to assist him in meeting I.C.'s developmental needs. In November 2023, the court terminated Father's services and set the matter for a section 366.26 hearing.

According to the Department's section 366.26 report, in May 2024, Father was unemployed and living temporarily with his mother, Monica R.

2

(Grandmother). Father informed the Department that he opposed placing I.C. with Grandmother. He said that she was financially unstable, would not have time for I.C., and would put " 'pressure' " on him to take the child. Two weeks before the contested section 366.26 hearing was to occur, Father filed a section 388 petition requesting additional reunification services. The court denied the petition, concluding Father did not show changed circumstance or that providing him more services would benefit I.C.

On June 27, 2024, the juvenile court terminated the parental rights of Father and Mother, and ordered a permanent plan of adoption.

## *Proceedings Following Termination of Parental Rights[1]*

Both parents appealed the order terminating parental rights, contending the Department failed to comply with the Indian Child Welfare Act (ICWA). Father also appealed the order denying his section 388 petition without a hearing.

### *Appellants' Section 388 Petition*

In November 2024, a section 388 petition was filed on behalf of Grandmother and I.C.'s paternal aunt Ashley O. (Aunt), appellants in the present appeal. Appellants' trial counsel requested that the court change a May 7, 2024 order that ostensibly found I.C. was in a "suitable" foster care placement by ordering instead that I.C. be placed with one his clients. According to the petition, a change of I.C.'s placement was warranted because appellants came forward at the time of I.C.'s birth but were "systematically denied notice and [the] opportunity to be heard on the subject of placement."

---

[1] The six-volume Clerk's Transcript on Appeal was not provided to appellants, who instead received a much shorter Clerk's Transcript containing documents to which they had access in the lower court. (See § 827.) Without explanation, the Department cites and relies on the six-volume transcript. We review only the record provided to appellants.

3

Facts in support of the petition were set forth in appellants' unsigned declarations.

Grandmother stated she was at the hospital when I.C. was born, and she knew the Department was taking him from his parents. Having no prior experience with a social services agency, Grandmother asked a person she thought was a social worker for placement of I.C., but was told she could not take him because Mother did not approve of I.C. living with Grandmother. Grandmother stated she was often the primary caregiver of I.C.'s nine-year-old sister, and she wanted the children to have a relationship, but the Department took no steps to facilitate that relationship despite her repeated requests. Grandmother stated further that Father resented her for setting appropriate boundaries with him, but Mother supported placing I.C. with his paternal relatives. Grandmother had completed the resource family approval (RFA) process, and she wanted I.C. placed in her care.

Aunt stated she was estranged from Father, who did not know where she lived. She became aware of I.C.'s foster care placement shortly after his birth, but the Department did not "reach out" to her until 2024. Aunt stated that if the Department had reached out, she would have "immediately" requested placement. Once Grandmother expressed her intention to take placement of I.C., Aunt assumed a "backup role." She anticipated completing the RFA process in the near future.

Appellants argued they were entitled to relief under section 388 because the Department failed properly to present the issue of relative placement to the court when parental rights were terminated. According to appellants, the Department always knew about Grandmother, but Father objected to her having I.C., and the Department failed its obligation to evaluate Grandmother for placement. Appellants argued the juvenile court

4

was required to apply the statutory placement preference afforded to family members under section 361.3 and to immediately place I.C. with them.

### Department's Response

In a December 2024 response to the section 388 petition, the Department provided background information about contact it had had with appellants and its reasons for maintaining I.C.'s placement with the prospective adoptive parents.

The Department reported its first contact with Grandmother occurred in early August 2022, the week after I.C. was born. During an absent parent search, an emergency response investigator called a contact number for Father and reached Grandmother, who reported that Father did not know Mother and was not expecting a baby. Later that day, however, Father contacted the Department, and during the ensuing investigation, the Department learned that Father and Mother had lived together at Grandmother's home prior to I.C.'s birth. Father confirmed Grandmother was his mother, but he did not want her involved in I.C.'s case and refused to provide contact information for any relatives.

The Department reported it initiated "Family Finding" and the results "came in on or about September 18, 2023." In October 2023, Grandmother came forward to request placement and reported she was estranged from Father. The Department initiated the RFA process, and it assessed Grandmother's home in April 2024. During the home visit, the social worker discovered Father was staying there and that Grandmother had also allowed Mother to stay at her house for a brief period. Grandmother was told Father could not stay at the house if I.C. was placed there, but Father reacted so negatively to that news that Grandmother reported she would move to a different home. Around that time, Aunt decided to pursue placement after

5

learning I.C. was going to be put up for adoption. Grandmother was sent a letter denying her placement request in September 2024, a month before her RFA application was approved.

According to the Department, Grandmother and Aunt were always aware of I.C.'s birth and his out-of-home placement, and yet they did not request placement or visitation until they learned I.C.'s parents were not going to reunify. The Department also maintained it had made multiple requests for family contact information, which Father refused to provide. It opined further that Grandmother would not have been eligible for placement prior to disposition because Father was living with her at that time. Finally, the Department reported I.C. was building a relationship with paternal relatives through visitation, which the Department supported.

### Court Proceedings

At a December 2024 permanency plan review hearing, the Department opposed appellants' petition, and the matter was continued for a determination whether a hearing was necessary.

At a January 7, 2025 hearing, appellants accused the Department of providing inaccurate information in its response to their petition and requested either that I.C. be immediately placed with them or that the court hold an evidentiary hearing. The Department in turn disputed appellants' factual allegations, and the Department and Minor's counsel both objected to the request for an immediate change of placement, emphasizing I.C. was settled and happy in the foster home where he had lived for two and a half years. The court ruled that it would set the matter for an evidentiary hearing. However, the Department filed a trial brief requesting that the court reconsider that ruling. The Department argued the section 388 petition was factually unsupported, as appellants had always known about I.C.'s

6

dependency but waited until reunification services were being terminated to pursue placement. The Department also argued the section 361.3 relative placement preference did not apply at that stage in the case, when Father's "reunification services were on the eve of being terminated." According to the Department, I.C.'s foster parents and prospective adoptive parents were the preferred placement under section 366.26, subdivisions (k) and (n). And it would be detrimental to, and not in the best interest of, I.C. to remove him from his prospective adoptive family, where he had lived his entire life, the Department argued.

At a February 2025 hearing, the court stated that after holding two meetings with the parties in its chambers it had determined that it needed additional information to make an informed decision about how properly to proceed. Specifically, the court wanted to know when appellants were given notice about I.C.'s dependency and the procedure for requesting placement. The Department was slow to respond and information it provided was not satisfactory to the court.

In April 2025, the court contemplated granting appellants discovery. The Department and minor's counsel objected and argued that disclosure of confidential child welfare records required a section 827 petition. Appellants objected to having to file a section 827 petition, but ultimately did. They requested all service logs and reports containing evidence of contact between the Department and paternal relatives. The Department continued to object.

Meanwhile, on January 31, 2025, this court issued our decision in *IC I*. We affirmed the denial of Father's section 388 petition, but found the Department's ICWA inquiry inadequate. Accordingly, the order terminating parental rights was conditionally reversed and remanded for the Department to comply with its ICWA obligations.

7

On May 6, 2025, the court found the Department had complied with the ICWA, and reinstated findings and orders from the earlier section 366.26 hearing. At the May 6 hearing, the Department provided redacted documents responsive to appellants' section 827 petition. Implicitly overruling objections to that petition, the court found that any disclosure would be preceded by an in camera review and limited to evidence of contacts between appellants and the Department. On May 13, the court signed an order after judicial review, granting appellants access to redacted Department records, which were released subject to a standard juvenile protective order. The court issued essentially the same order as to a section 827 petition filed by I.C.'s caregivers who had by that juncture been granted de facto parent status.

### *The Redacted Records*

More than 400 pages of records were disclosed, although the material was heavily redacted. Based on our review, we note these relevant facts.

On August 5, 2022, the Department submitted a Family Finding referral. For reasons not disclosed by the record, the Department did not receive the results of that search until September 18, 2023.

Meanwhile, however, the Department obtained specific information about Grandmother, including her name and address. In early August 2022, an investigator searching for I.C.'s father made phone contact with Grandmother, who denied any connection to I.C. However, by the end of August, the Department had learned that Father and Mother lived together in the garage of Grandmother's home before I.C. was born. And at a CFT meeting in April 2023, Father reported Grandmother was the only family in his life, although he did not want her involved in raising I.C.

8

On October 6, 2023, Grandmother requested that the Department place I.C. in her care because she did not want him to be with strangers. Grandmother told the social worker she was estranged from Father, who told her not to get involved; she tried to meet I.C. at the hospital where he was born, but Mother objected; and she attempted to follow up after I.C.'s birth by leaving a message for a person she (mistakenly) believed was a social worker. The social worker provided Grandmother with information to begin the RFA process, and subsequently followed up to confirm the RFA referral was made. The worker also arranged supervised visitation for Grandmother.

Later in October 2023, Grandmother attended a CFT meeting, held in advance of the 12-month status review. Father objected to Grandmother participating, and renewed his objection to having I.C. placed with Grandmother in the event he should fail to reunify. Nevertheless, Grandmother elected to proceed with her RFA application, which she completed on November 13, 2023.

On April 5, 2024, the social worker conducted a home visit at Grandmother's home as part of the Department's relative placement assessment. During the visit and follow-up calls, concerns arose about Father's access to Grandmother's home and Grandmother's decision to permit Mother to stay there on a recent occasion when Mother was "clearly under the influence." Father continued to object to placing I.C. with Grandmother or any of his relatives. On April 26, Aunt expressed her interest in placement and adoption, sharing that she decided to come forward after learning I.C. was going to be put up for adoption.

In the May 2024 section 366.26 report, the Department reported that Father continued to oppose placing I.C. with his family members, including Grandmother. The report included information about appellants' RFA

9

applications, and discussed concerns about Grandmother's "lack of boundaries" with I.C.'s parents. The Department also reported that I.C.'s paternal relatives and resource parents both expressed a desire to provide permanency for I.C. in the form of adoption.

On July 8, 2024, a couple of weeks after parental rights were terminated, a social worker told I.C.'s caregivers that the "paternal relatives were denied placement."

On July 11, 2024, the Department held a CFT meeting attended by appellants and I.C.'s caregivers. One purpose of the meeting was to discuss visitation for appellants should I.C. remain in his current placement. Appellants stated that it was unfair to place I.C. with the caregivers because he was not an orphan and had family that had been fighting for him, and Grandmother felt she had completed everything asked of her by the Department. In expressing how the process had been unfair, Aunt referred to the caregivers' relationship with I.C. as "just a job."

After the July 2024 CFT meeting, the social worker followed up with Aunt about her remark, which had been perceived as insensitive, and about the Department's desire for I.C. to have a relationship with appellants regardless of the placement decision. The social worker also sent an email to the Foster Family Agency service provider, stating that she wanted to assure the caregivers that the Department did not intend to change I.C.'s placement, but wanted to be sure it was on "strong legal ground," especially if Father appealed the order terminating parental rights. The social worker reiterated the Department's goal was for visits with the biological family to continue.

On August 8, 2024, the Department finally sent letter notices of I.C.'s dependency to more than 30 relatives, including appellants. The letter stated that IC was temporarily removed from his parents and may have been placed

10

in foster care. The letter invited input, suggested ways for relatives to support the family, including by requesting placement, and enclosed material containing " 'Important Information for Relatives.' "

On September 20, 2024, the Department notified Grandmother it did not recommend that I.C. be placed in her care. The Department's letter discussed a two-part assessment of Grandmother's home and her ability to meet the needs of I.C. Part One was to be completed by the RFA unit, and was still pending. But the social worker who completed Part Two determined that the placement was not a good match and did not recommend that I.C. be placed with Grandmother for several reasons. First, the court had terminated parental rights and ordered a permanent plan of adoption. Second, the social worker had concerns about Grandmother's judgment and ability to set limits with the biological parents in order to provide a safe environment for a child, as evidenced by her decision to allow Mother to stay in her home while Mother was displaying signs of substance abuse. Third, Grandmother's RFA application failed to disclose that Father had been staying in her home, and her belief this information was unimportant was said to be an indication of her inability to set limits to protect I.C. Finally, I.C. had been in his placement since he was discharged from the hospital and had an established parent/child-type relationship with caregivers who ensured his safety and wellbeing.

As of October 8, 2024, Grandmother's RFA application was "fully" approved by the RFA unit. The following month, appellants filed their section 388 petition requesting that I.C. be placed with them.

**The Order Denying Appellants' Section 388 Petition**

A hearing was set for June 3, 2025, for the court to rule on the section 388 petition. Prior to ruling, the court stated this case was difficult because

11

the dependency system focuses on reunifying families and it appeared that efforts to make sure the family stayed connected did not occur early on in this case. The court stated that it was important to acknowledge "out loud" that mistakes were made and to be transparent about them. With that caveat, the court stated that it would deny appellants' petition.

As a preliminary matter, the court expressed doubt as to whether appellants' request raised a section 388 issue or a section 366.26 issue. The court opined appellants were attempting to request a placement hearing after their placement request had been denied, and observed there was confusion in the case law as to what to call this type of request made at a stage of the proceeding after parental rights had been terminated. Turning to the particular facts of this case, the court then made a series of findings in support of its decision to deny appellants' petition.

First, between August 2022 and October 2023, the Department failed to conduct an adequate inquiry regarding the identity of I.C.'s paternal relatives. Despite Father's refusal to disclose information about his family, the Department failed to use the information it had to make any meaningful attempt to discover I.C.'s paternal relatives. The court also found that although the Department initiated a family finding inquiry in August 2022, it did not receive the results of that inquiry until a year later, which was not "due diligence." Moreover, the court should have inquired at every status hearing about efforts to locate relatives, but failed to do so.

The court recognized that Grandmother knew I.C. was in foster care, but it found that Grandmother had no responsibility to come forward sooner because once the government took custody of the child, it was the responsibility of the government to locate appellants and give them notice of the dependency. This was an important obligation because "early on" in the

12

proceeding, relatives have the right to come forward, request visitation, request placement, and share information, and these things did not happen for the paternal family, the court found.

Next, the court found that when Grandmother did come forward to request placement in October 2023, the Department failed to give her request full and fair consideration, as required by the relative placement preference. As evidence of that failure, the court observed that the Department waited until April 2024 to assess Grandmother's home. In addition, although Aunt also requested placement, records produced by the Department failed to show that her application received preferential consideration, the court observed.[2]

The court was particularly troubled by a service record indicating that before Grandmother was advised her placement request was denied, a social worker told the caregivers Grandmother's request would be denied. In the court's view, the social worker was "essentially saying, you know, 'Don't worry. We're denying placement with the paternal grandmother.' " That this message was delivered almost three months before Grandmother was notified her request was denied was not "indicative" to the court "of relative preference."

The court found that the Department's case notes revealed it had an established relationship with the foster parents and was grateful for the care they provided I.C., but also that the social workers were "very much interested in maintaining this placement and did not provide paternal relatives with a fair assessment." In this regard, the court found it necessary to "acknowledge" that delays in locating paternal relatives and providing

---

[2] Aunt's request that this court "accept new evidence" regarding the RFA unit's approval of her application is denied. Since the juvenile court found the Department failed to properly assess Aunt's placement request, her new evidence is not relevant.

13

notice of the dependency had cost the family time they could not get back: they did not have the opportunity to get to know I.C. as an infant; and they did not have the opportunity to establish a relationship with the Department and "prepare themselves for placement." The court believed that the Department's errors, and the court's own errors, were indicative of a "lack of understanding . . . regarding how a relative placement should be exercised." And in part because of this case, the superior court had hosted training sessions for judges, attorneys, and social workers regarding the relative placement preference and the assessment of family members who request placement.

Next, the court found that the Department did ultimately complete an assessment of Grandmother's placement request, and "the denial at the time was a fair denial." There were "at least two factors that had to be considered that went against the placement," the court found: Father adamantly opposed placing I.C. with Grandmother; and Father had ongoing access to Grandmother's home, which indicated there could be safety concerns if I.C. was placed there. (See § 361.3, subds. (a)(2), (a)(7)(A) & (D).)

Finally, I.C. had been in the de facto parents' home "all of his life," and the court, as well as the Department, was grateful for the care they gave the minor. The de facto parents also took the time to get to know I.C.'s paternal relatives and allowed them to know I.C. as well.

Considering all these circumstances, the court concluded that granting appellants' petition would not be in the best interest of I.C. As support for this conclusion, the court relied on authority establishing that the " 'overriding concern of dependency proceedings' " is " 'not the interest of extended family members, but the interest of the child. Regardless of the relative placement preference, the fundamental duty of the Court is to assure

14

the best interest of the child whose bond with the foster parent may require that placement with a relative be rejected.' " (Quoting *In re Lauren R.* (2007) 148 Cal.App.4th 841 (*Lauren R.*).)

## DISCUSSION

Appellants contend the juvenile court abused its discretion by denying their section 388 petition. They reason that once the court found the relative placement preference had been violated, the court had no choice but immediately to place I.C. with one of them. We conclude the court did not abuse its discretion under the circumstances presented here.

"We start with the fundamental premise that the underlying purpose of dependency law is to protect the welfare and best interests of the dependent child." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1424–1425.) "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) Thus, throughout the dependency proceeding, "the focus" is always on the child. (Cf. *Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 672.)

This focus on the wellbeing of the child is manifest in the procedure for changing an out-of-home placement. A motion to change or reconsider the minor's placement may be brought pursuant to section 388 by any person with an interest in the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) The burden is on the moving party to show that the change of placement is in the best interest of the child. (*Ibid.*) And although a section 388 petition can be used to request a placement change at any time, the best interest inquiry must reflect the stage of the proceeding at which the

15

change is being sought.  After reunification services have been terminated, the paramount goal is not family reunification but providing the child with " 'permanency and stability.' " (*Stephanie M.*, at p. 317.)

The juvenile court's determination of what placement best serves the interest of a dependent child is reviewed for abuse of discretion.  (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)  Here, the record shows that the court considered the pertinent facts before concluding it would not be in the best interest of I.C. to change his placement from the home of the de facto parents, who had provided him safety and stability for his entire life and were committed to providing him permanency through adoption.  We conclude this was no abuse of its discretion.  (*Stephanie M.*, at pp. 318–319 [when more than one inference can reasonably be deduced from the facts, appellate court has no power to substitute its decision for that of trial court].)

Appellants contend the court did abuse its discretion because it failed to give dispositive weight to the relative placement preference codified in section 361.3.  This argument fails at multiple levels.

"Section 361.3 gives 'preferential consideration' to a request by a relative of a child who has been removed from parental custody for placement of that child.  ' "Preferential consideration" means that the relative seeking placement shall be the first placement to be considered and investigated.' (*Id.*, subd. (c)(1).)  The preference applies at the disposition hearing and thereafter 'whenever a new placement of the child must be made.'  (*Id.*, subd. (d).)" (*In re M.H.* (2018) 21 Cal.App.5th 1296, 1302–1303 (*M.H.*).)  Section 361.3 contains a nonexclusive list of factors for the social worker and the court to consider when determining whether placement of the child with a relative is appropriate, the first of which is "[t]he best interest of the child." (§ 361.3, subd. (a)(1).)  Other factors include the "wishes of the parent, the

16

relative, and child, if appropriate" (*id.*, subd. (a)(2)), and the "ability of the relative" to provide a safe and stable environment (*id.*, subd. (a)(7)(A)), and to "[p]rotect the child from their parents" (*id.*, subd. (a)(7)(D)).

Some courts have found that the relative placement preference applies throughout the reunification period without regard to "whether a new placement is required or is otherwise being considered by the dependency court." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 795 (*Joseph T.*); but see *M.H.*, supra, 21 Cal.App.5th at p. 1303 ["preference is applicable after disposition only when a new placement is necessary"].) However, "it is well settled section 361.3 does not apply after termination of parental rights." (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 492, italics omitted (*Amber G.*); accord, *In re Sarah S.* (1996) 43 Cal.App.4th 274, 277 [relative preference "does not apply to a placement made as part of a permanent plan for adoption"]; see also *In re Maria Q.* (2018) 28 Cal.App.5th 577, 583 [preference does not apply to placement request for minors whose permanent plan is long-term foster care].)

In this case, appellants filed their section 388 petition four months after parental rights were terminated and I.C. was freed for adoption. At that stage, the relative placement preference does not apply. "There is no relative placement preference for adoption." (*Lauren R.*, *supra*, 148 Cal.App.4th at p. 855; accord, *Amber G.*, *supra*, 86 Cal.App.5th at p. 492.) During the permanency phase of a dependency case involving a child freed for adoption, "[s]ection 361.3 is replaced by the caretaker preference (§ 366.26, subd. (k)) and prospective adoptive parent preference (§ 366.26, subd. (n))." (*Amber G.*, at p. 492; accord, *In re Sarah S.*, *supra*, 43 Cal.App.4th at p. 277.)

Appellants contend timelines for applying the relative placement preference are not set in stone. Indeed, when a relative requests a placement

17

hearing after the reunification period but before termination of parental rights, the juvenile court may be required to evaluate the relative under the placement preference statute if the record shows that the relative sought placement during the reunification period and the agency failed properly to apply the relative placement preference. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1027 (*Cesar V.*); *In re Isabella G.* (2016) 246 Cal.App.4th 708, 712 (*Isabella G.*).)

In this case, although there is evidence appellants waited to see if Father would reunify before they came forward to request placement, Grandmother did make that request of the Department the month before the court terminated Father's reunification services. However, appellants waited until after parental rights were terminated to request a court order placing I.C. in their custody, and we find no authority applying the relative preference after parental rights have been terminated. Regardless, the record shows that the juvenile court did apply the relative placement preference when it analyzed the Department's response—or lack thereof—to Grandmother's request in October 2023 that I.C. be placed in her care. Substantial evidence supports the juvenile court's findings that the Department failed diligently to search for family members and to provide timely notice of the dependency, and that the Department failed to give Grandmother's belated request the full and fair consideration it deserved, but also that the Department's eventual denial of that request was fair in light of Father's opposition to the request, Father's ongoing access to Grandmother's home, and the good care I.C. had all his life received in the de facto parents' home. These aspects of the court's analysis appear sound. They reflect that the court did take account of relative preference issues when assessing whether a change in placement would be in the best interest of I.C.

18

Importantly, the relative placement preference was not the only relevant statutory preference at issue when appellants filed their petition. Section 366.26, subdivision (k) provides: "Notwithstanding any other law, the application of any person who, as . . . foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the . . . foster parent and removal from the . . . foster parent would be seriously detrimental to the child's emotional well-being." This statutory preference applied at the time appellants requested that the court change I.C.'s placement because they filed their section 388 petition after I.C. had been freed for adoption and his foster parents wanted to adopt him. Although it is not clear the court was sufficiently cognizant of this fact, any error in failing to consider the caretaker preference would have benefited appellants.

Regardless of what preference did or did not apply, the juvenile court was on sound legal ground by basing its decision on the best interest of I.C. (*Lauren R.*, *supra*, 148 Cal.App.4th at p. 855 ["overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child"]; *Amber G.*, *supra*, 86 Cal.App.5th at pp. 493–494 [same]; *In re L.M.* (2019) 39 Cal.App.5th 898, 911 [best-interest standard drives whether to remove child from prospective adoptive placement under § 366.26, subd. (n)].) Appellants insist, as they did below, that the only remedy for the Department's failure to apply a relative preference earlier in this case is to place I.C. with them. Appellants cite no authority supportive

19

of this view, which we find difficult to reconcile with settled law focusing *always* on the best interest of the child.

It is equally well settled that the relative placement preference "is not a relative placement *guarantee*." (*Joseph T.*, *supra*, 163 Cal.App.4th at p. 798; *Amber G.*, *supra*, 86 Cal.App.5th at p. 492.) The juvenile court was clear in its view that the Department erred by failing to afford preferential consideration to Grandmother. For purposes of this appeal, we accept the court's finding in light of the Department's delays in locating and noticing paternal relatives about this dependency, and in evaluating appellants' homes for placement. But other factors were also at play by the time the court was asked to weigh in. Appellants waited to see if Father would reunify before they requested that the Department place I.C. with them, and they were candid about their motivation that I.C. be raised by biological family. Appellants waited until after parental rights were terminated and I.C. was freed for adoption before they filed their petition requesting that the court override the Department's decision. Meanwhile, I.C. continued to live and thrive in the home of caregivers with whom he had a child/parent-like bond. Considering all these factors was a daunting and difficult task for the court, and we find no abuse of discretion in its decision.

In their reply brief, appellants appear to contend that the juvenile court had no discretion to deny their petition under section 388—that it could not allow "the passage of time" to be the reason that changing I.C.'s placement became contrary to his "best interests." According to this argument (1) appellants were entitled to a hearing under section 361.3, without even having to file a section 388 petition; and (2) the juvenile court was required by law to base its decision on an independent assessment of the section 361.3

20

factors, whether or not appellants could show that placing I.C. with them was in the child's best interest.  We reject both prongs of this argument.

To support the contention they were not required to file a section 388 petition, appellants mistakenly rely on *Isabella G.*, *supra*, 246 Cal.App.4th 708.  That case holds that "when a relative requests placement of the child prior to the dispositional hearing, and the Agency does not timely complete a relative home assessment as required by law, the relative requesting placement is entitled to a hearing under section 361.3 without having to file a section 388 petition." (*Isabella G.*, at p. 712.)  In announcing this rule, the *Isabella G.* court explicitly declined to address whether a section 388 petition would be required to remove a child from a placement after parental rights have been terminated.  (*Isabella G.*, at p. 712, fn. 3.)  *Isabella G.* is inapposite because (1) appellants did not request placement of I.C. prior to the dispositional hearing; and (2) appellants requested a hearing on I.C.'s placement several months *after* parental rights were terminated.  We decline to extend *Isabella G.* to reach this late stage in the dependency process.  (See *Amber G.*, *supra*, 86 Cal.App.5th at p. 489 ["following termination of parental rights, the statutes become laser focused on quickly facilitating adoption"].)

The second prong of appellants' argument is similarly flawed; their contention the juvenile court was required to base its ruling on an independent assessment of the section 361.3 factors assumes erroneously that section 361.3 applies to a potential placement change after parental rights have been terminated.  Appellants mistakenly rely on *Cesar V.*, *supra*, 91 Cal.App.4th 1023.  The issue in that writ proceeding was "whether the relative placement preference applies when a new placement becomes necessary after reunification services are terminated but before parental rights are terminated and adoptive placement becomes an issue." (*Id*. at

21

p. 1032.) The appellate court concluded that the preference does apply in that discrete situation and therefore the juvenile court should have exercised independent judgment when evaluating an agency's decision not to place the children with their grandparents. (*Id.* at p. 1034.) By contrast, the case before us does not involve a change of placement that became necessary before parental rights were terminated. Appellants sought to change I.C.'s placement after parental rights were terminated because they did not want I.C. to be raised by nonbiological family. They made their request by filing a petition under section 388 for an order removing I.C. from his prospective adoptive parents. The court denied the petition as not in the best interest of I.C. We find no error in that ruling.

### DISPOSITION

The order is affirmed.

TUCHER, P. J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*In re I.C.* (A173641)

22